FORMALL *v.* STANDARD OIL CO.

DANGEROUS PREMISES—INJURY TO CHILD—INVITATION OF EMPLOYÉ.

*1. An employer is not bound by the act of his employé, not his *alter ego*, in inviting or permitting children to be upon the premises.

2. Tacit acquiescence on the part of an employer in permitting children upon his premises is not sufficient to fasten liability upon him for injuries caused by negligent conditions thereon.

Error to Wayne; Donovan, J. Submitted April 3, 1901. Decided July 10, 1901.

Case by August Formall, administrator of the estate of Paul Formall, deceased, against the Standard Oil Company, for negligently causing the death of plaintiff's intestate. From a judgment for plaintiff, defendant brings error. Reversed.

*John D. Conely,* for appellant.

*James H. Pound,* for appellee.

GRANT, J. The defendant was the owner of two barns situated at the corner of Lovett avenue and Torrey street, in the city of Detroit; one barn running east and west, and the other north and south. The east and west barn had 23 stalls, and the north and south barn had 14 stalls.

*Head-notes by GRANT, J.

There were two box stalls in the north and south barn, and one in the east and west barn.   The defendant kept in the stalls a number of horses, which were used for hauling its tank wagons to different parts of the city. The plaintiff and his family lived across the street from the barns, and about 175 feet distant therefrom.   Plaintiff's children often went across to the barn to play and assist in doing some sweeping and cleaning.   Peter Wynne, who looked after the barn, occasionally gave them a few pennies.   Peter Wynne had no authority to hire or discharge persons for the defendant.   His brother did all the hiring and discharging.   Nor had he any authority to invite boys upon defendant's premises.

On the 29th day of June, 1894, two boys, Charles Bass and Rudolph Formall, one of the sons of the plaintiff, had been in the barn about 8 o'clock in the morning. Wynne got in a buggy to drive down town, and ordered the boys out of the barn, and Joseph Lockley shut the door, and fastened it on the inside.   The two boys, Bass and Formall, testified that Peter Wynne told them to return when the shavings came, and make the beds in the stalls, and that he promised them 25 cents for so doing. This Wynne denied.   The shavings came some time after Wynne left, and the two boys, Charles Bass and Rudolph Formall, during Wynne's absence, went into the barn to make the beds for the horses.   Paul Formall, a boy 7½ years old, and exceptionally small for the age, a brother of Rudolph and son of plaintiff, followed them into the barn.   The testimony shows that Paul was too small to assist in doing much sweeping or cleaning, but Charles Bass and Rudolph Formall testify that, a short time previous to the accident, he had a broom in his hands, and was doing the best he could.   There is no evidence that the boys ever went into the barn during the absence of Wynne before the day of the accident, or that they were ever invited or permitted by Peter Wynne to enter in his absence.   The door of the west box stall of the north and south barn fell upon Paul, and killed him instantly.   This

action is brought to recover damages under the statute in cases when death is caused by the wrongful act, neglect, or default of another. Section 10427, 3 Comp. Laws.

There is no evidence in the case as to what caused the door to fall. A horse was in the stall at the time of the accident. The door was a large oak door, and weighed about 200 pounds. It had two hangers bolted upon the top, which ran upon an iron track. The door was 4½ feet wide and 8 feet high. It was constructed in 1891, at the time the barn was built. The hangers were of a kind that it was customary to use in Detroit from the time the barn was built to the time of the accident. The wholesale hardware men of Detroit sold as many of this style of hangers as any other. The track, the hangers, and the method of regulating the track, and the hanging of the door, and the use of the hangers, were in common and ordinary use at the time. The plaintiff recovered.

The questions discussed in the brief of counsel for defendant may be reduced to two: *First*, whether there was any evidence that the door was improperly constructed, insecurely fastened, or out of repair; and, *second*, whether the testimony tended to show that the decedent was on the premises of defendant under an implied invitation. In our view of the case, it is only necessary to discuss one point, viz.: Was plaintiff's decedent invited into, or given personal permission to be in, the barn by the *alter ego* of defendant? Peter Wynne was an employé, a laborer, whose sole duty it was to clean out the stable, bed, feed, and water the horses. He was not clothed with any authority whatever to represent the defendant. He was simply a laborer, employed to take care of the stable. He had no authority to employ boys or any one else to do his work. There is no evidence that the defendant or its *alter ego* knew that he was so doing. Peter Wynne's duties were limited exclusively to the manual labor he was employed to perform. His act in employing those boys to do his work, and in paying them, was not the act of the defendant. If injured in consequence of being upon the

premises by Peter Wynne's authority, the defendant was not liable for injury to any of them. *Flower* v. *Railroad Co.*, 69 Pa. St. 210 ( 8 Am. Rep. 251); *Driscoll* v. *Scanlon*, 165 Mass. 348 ( 43 N. E. 100, 52 Am. St. Rep. 523 ); *Sherman* v. *Railroad Co.*, 72 Mo. 62 ( 37 Am. Rep. 423 ).

Is every person who hires a man to take care of his stable responsible for damages to those whom such employé permits or invites to be upon the premises, and that against his express instruction, as was the fact in this case? This case was evidently tried and submitted to the jury upon the theory that these boys had been not only permitted by Peter Wynne to be upon the premises, but had been employed by the defendant through him. In the charge of the court Peter Wynne's name is frequently used, while that of Thomas Wynne, the *alter ego* of the defendant, is not mentioned, and no reference whatever is made to any act or permission of his binding the defendant. This will more conclusively appear from the fact that the learned counsel for the defendant framed his brief entirely upon the question of the authority of Peter Wynne, while the plaintiff's attorney has devoted the main portion of his brief to an argument upon the same theory; citing and relying upon *Powers* v. *Harlow*, 53 Mich. 508 ( 19 N. W. 257, 51 Am. Rep. 154 ), a case which in no sense is the parallel of this. The only reference made in plaintiff's brief to the position of Thomas Wynne is in the following language:

" Defendant had for years been receiving the benefit of infantile labor, which was open, public, and notorious. This was with the knowledge at least of its principal foreman, Tom Wynne, and done by his brother."

Manifestly, it would be unjust, and I think unwarranted in practice, to now sustain this verdict and judgment, which were obtained, not upon the theory that Thomas Wynne employed or permitted these boys, including the deceased, upon the premises, but upon the sole theory that Peter Wynne could and did bind this defendant by his conduct. The above statement in plaintiff's brief is incor-

rect in that the defendant had not received any benefit of infantile labor, and it was not open, public, and notorious that Peter Wynne had employed them, or that Tom Wynne had any knowledge of such employment by Peter. It is just to Peter Wynne to say that he absolutely denies employing these boys.

The propensity of boys to enter, and the difficulty of keeping them away from, places of this character, are matters of common knowledge. It is significant that these boys chose to enter this barn in the absence of Peter Wynne,—a thing they had never done before,—and when the doors were closed. The other two boys testified, "We got into the barn through the front door, which was open far enough so that we could just get in." The testimony of defendant's witnesses is that the barn door was fastened from the inside, and that one of the boys went into the yard, and got in through a back door, and unhasped the front door. The closing of the door was notice to everybody, not invited there, to keep out. There is no testimony to indicate that these boys had ever been invited to enter the barns for work or play, or any purpose whatever, when the doors were closed, and the employés lawfully in charge were away. Not one of these boys testified that they were ever invited or permitted there by Peter Wynne in his absence. The testimony on the part of the defendant is that the boys were playing upon this door, riding to and fro upon it. This the two boys denied, and testified that Paul was behind them, in front of this door; that they did not see the door fall, and did not know why it fell. There were a horse and a colt in the box stall according to plaintiff's testimony, and only a horse according to defendant's testimony. Why the door fell is unknown. There is testimony that it had fallen once or twice before by the horses pressing against it.

There is no evidence that Thomas Wynne invited the deceased boy, or the other two, upon these premises. When the plaintiff rested his case, there was not a scintilla of evidence connecting anybody but Peter Wynne with

inviting or permitting these boys upon the premises. Thomas Wynne, called by the defense, testified positively to driving the boys away, including the deceased, and that he gave instructions to Peter not to permit them upon the premises. Thomas Wynne had general charge of the yard, barn, and warehouse of the defendant, and superintended the business there. How often his duties took him to the barn does not appear. It is now sought to fix liability upon this defendant because upon cross-examination Thomas Wynne testified as follows:

"*Q.* Didn't you swear on the hearing that you had an idea how the accident occurred? No or yes, or you do not know.

"*A.* I will explain it to you.

"*The Court:* Make the answer to it yes or no. If you cannot answer it yes or no, say you do not know.

"*Q.* Did you do it?

"*A.* Well, I can answer it if you will give me a chance to answer it in my own way.

"*Q.* No, sir; no chances on this. Just answer it yes or no.

"*A.* The question, as I understand it in my mind, I know that the door fell—

"*Mr. Conely:* I except to your honor's ruling to require the witness to answer yes or no, and refusing to let the witness answer it in his own way.

"*The Court:* I have not made that ruling, and never intended to make it; but the cross-examiner has a right to limit his answer, and then the witness may go to his own counsel, and make his answer in his own way. I have not ruled he cannot explain, but the cross-examiner can stop him, and then his own counsel can straighten him out.

"*Mr. Conely:* I take an exception to the ruling.

"*The Court:* I do that every day and every year for six years. .

"*Mr. Conely:* Oh, well, your honor, I want an exception, and the Supreme Court may test it.

"*The Court:* I am satisfied the way it stands now.

"*Q.* Do you mean to tell this jury that boys could be used in that barn sweeping out, and cleaning it up, and putting in new bedding, and taking out the old shavings out in the manure pile, and all that, for three or four years, and you not know it? No or yes.

"*A.* That is one of the reasons why I told my brother to keep them out.

"*Q.* No or yes,—you did know it, did you?

"*A.* I knew that they were there.

"*Q.* You knew your brother was harboring them?

"*A.* No, sir; I did not claim to harbor them.

"*Q.* You knew that he was?

"*A.* No, sir.

"*Q.* How many times did you see them there?

"*A.* Well, I never counted them.

"*Q.* How many, like the sands of the sea, you could not state?

"*A.* Not so many.

"*Q.* Why didn't you discharge your brother the second time after you told him not to have them there and they were there?

"*A.* Because I wanted to keep my brother to work. I didn't want to make a charge of him, or a bum on the street, and therefore I kept him to work."

This claim is based upon the last question and answer. This testimony goes no further than that Mr. Wynne, defendant's *alter ego*, knew that the boys went into the barn. This does not amount, in the law, to an invitation or a legal permission, which fastens upon the employer the same duty that it would owe to its employés, or to those entering the premises by invitation. Permission is not enough, even in the case of an infant. *Hargreaves* v. *Deacon*, 25 Mich. 1. In that case a child of tender years was killed by falling into a cistern on defendant's premises, which was left uncovered. The child "was permitted to go upon the premises without any special personal permission or invitation to himself, but by a tacit acquiescence of the occupants in not excluding such persons as saw fit to enter them." Thomas Wynne, under no aspect of this case, as it now stands, did any more than to tacitly acquiesce in the presence of these boys upon the premises. But tacit permission is not enough to establish liability for negligent conditions on one's own premises. In that case the defendant was held not liable; and, on account of the importance of this case to persons employing others to take care of their property, I quote from that decision:

" There is some danger, in dealing with these questions, of confounding legal obligations with those sentiments which are independent of the law, and rest merely on grounds of feeling, or moral considerations. We feel, usually, more indignation at wrongs done to children than at wrongs done to others. But the law has not usually given them civil remedies on any such basis. Nor does it usually, if ever, impose any duties on strangers towards them, resting entirely on the fact that they are children. Those who have any special dealings with them — as parents, teachers, and employers—incur obligations appropriate to their relations, and differing from those incurred towards others in proportion to the necessity of care and protection and the risk of injury. But those who have no such relations with them are not liable for negligence in carrying on their own business, beyond what would be their liability to others, as well as children, who are equally free from blame."

The rule is there further stated:

" A person incurs no duties towards persons by not warning or driving them from his premises; and they go there, if mere volunteers, and without invitation, at their own risk."

The soundness of that case has never been questioned by this court. On the contrary, it has been regarded by the profession as establishing the rule which must be followed.

We think the judgment should be reversed, and no new trial ordered.

The other Justices concurred.