## BOGDON v. LOS ANGELES & S. L. R. CO.

No. 3683.   Decided February 20, 1922.   (205 Pac.   571.)

1. APPEAL AND ERROR—APPELLEE'S EVIDENCE MUST CONTROL, EXCEPT WHERE APPELLANT'S EVIDENCE IS UNCONTRADICTED. On appeal from denial of a nonsuit to plaintiff, plaintiff's evidence must control, except as to such matters as are not shown by his evidence and as to which defendant's evidence is uncontradicted.

2. NEGLIGENCE—RAILROAD CARS NOT ATTRACTIVE NUISANCES. Railroad cars used in the ordinary course of business do not come within the class of instrumentalities that may be designated as attractive nuisances within the doctrine that a person maintaining an attractive nuisance upon his premises must guard against injury to young children attracted thereby.[1]

3. EXPLOSIVES—EVIDENCE HELD NOT TO SHOW BOY WAS ENTICED BY POWDER IN CAR. Evidence that a boy went upon a railroad right of way looking for sheep, and while there collected from the floor of a railroad car some, powder, which he exploded, causing severe burns to himself, held to show that the powder did not entice him onto the railroad premises so as to render the railroad company liable under attractive nuisance doctrine.

[1] Brown v. Salt Lake City, 33 Utah, 222, 93 Pac. 570, 14 L. R. A. (N. S.) 619, 126 Am. St. Rep. 828, 14 Ann. Cas. 1004; Smalley v. Railroad, 34 Utah, 423, 98 Pac. 311; and Charvoz v. Salt Lake City, 42 Utah, 455, 131 Pac. 901, 45 L. R. A. (N. S.) 652.

4. EXPLOSIVES—RAILROAD CAN ASSUME CONSIGNEE PERFORMED DUTY TO REMOVE POWDER FROM CAR. A railroad, which had transported powder in its usual course of business in a car which was unloaded by the consignee, who had received numerous consignments of powder, and always handled them without accident, could assume that the consignee in unloading the particular car would not leave any powder therein, so that it was not required to inspect the car after unloading.

5. TRIAL—WHETHER FACT OUGHT TO HAVE BEEN KNOWN IS QUESTION OF LAW WHEN EVIDENCE DID NOT TEND TO SUPPORT CONCLUSION. Though it is ordinarily a question for the jury whether a person knew, or ought to have known, a particular fact, the question is one of law for the court, where there is no dispute concerning the facts, and there is no fact on which the conclusion that defendant should have known could be based.

6. EXPLOSIVES—RAILROAD NOT LIABLE FOR POWDER LEFT IN CAR BY CONSIGNEE WITHOUT ITS KNOWLEDGE. A railroad company is not liable for injuries to a boy from the explosion of powder which the boy found in one of its cars, where the powder was left in the car by the consignee, who unloaded it a short time before the accident, and the railroad company had no knowledge that it was in the car, or that a boy would be apt to see it there.

7. NEGLIGENCE—NO LIABILITY, UNLESS REASONABLE CARE WOULD HAVE PREVENTED ACCIDENT. In the conduct of modern business enterprises, accidents will, and of necessity must, happen, but the law does not impose liability therefor, unless the party charged with negligence could by the exercise of reasonable care and diligence have prevented the accident.

8. NEGLIGENCE—NO LIABILITY TO INJURED CHILD TO WHOM DEFENDANT OWES NO DUTY. Though children of tender years are favored by the law, they cannot recover for an injury unless it is shown that the person causing the injury owed a duty to the injured child, which he failed to discharge by failing to exercise the degree of care required by law under the circumstances.

9. NEGLIGENCE—CONTRIBUTORY NEGLIGENCE SHOWN BY PLAINTIFF'S EVIDENCE DEFENSE WITHOUT PLEADING. In an action for injuries to a boy, the defendant railroad company can, without affirmatively pleading contributory negligence, rely upon contributory negligence which appears by the plaintiff's own testimony, and may move for a nonsuit or directed verdict based on such contributory negligence, or request the court to charge upon that issue.[2]

[2] Smith v. Ogden & N. W. Ry. Co., 33 Utah, 129, 93 Pac. 185.

GIDEON and WEBER, JJ., dissenting in part.

Appeal from District Court, Third District, Salt Lake County; *J. Louis Brown*, Judge.

Action by Dan Bogdon, a minor, by his guardian ad litem, John Bogdon, against the Los Angeles & Salt Lake Railroad Company. Judgment for the plaintiff, and defendant appeals.

REVERSED.

*R. B. Porter*, of Salt Lake City (*Geo. H. Smith, Jno. V. Lyle,* and *Dana T. Smith,* all of Salt Lake City, of counsel), for appellant.

*Willard Hanson*, of Salt Lake City, for respondent.

FRICK, J.

Dan Bogdon, a minor, by his guardian ad litem, brought this action to recover damages for personal injuries which he alleges he sustained through the negligence of the defendant. In view that there is no question raised respecting the sufficiency of the complaint, it is unnecessary to set forth the allegations therein contained, except to state that the plaintiff relies upon the doctrine of attractive nuisances and further relies upon the law applicable to the storing of dangerous explosives upon the owner's premises at such a place or places where children of immature judgment are permitted to go to play. It is likewise sufficient to say that the answer denies all the alleged acts of negligence. It will be sufficient to state the controlling facts as they are made to appear from the undisputed evidence as the same appears in the bill of exceptions. Those facts, in substance, are:

That in July, 1917, the Hercules Powder Company, located at Bacchus, Utah, shipped to its agent, the Tintic Powder & Supply Company, as consignee, to Eureka, Utah, a car of

explosives, including therein "100 kegs of 4-F black blasting powder"; that the powder was shipped in metal kegs containing 25 pounds each; that while the shipment originated on the line of another railroad, it, nevertheless, was transported over defendant's railroad, and reached its destination, Eureka, which is on defendant's railroad; that the powder was shipped in U. P. car No. 77451, and said car arrived at Silver City, where the accident occurred, after the powder had been unloaded therefrom, at 10:30 a. m. on July 14, 1917; that the car was placed on the side track at Silver City, Utah, where it remained until about 4 p. m., or, perhaps, a little earlier than that, of that day, when it was taken to the Utah ore sampler at Silver City, where it was reloaded and "billed out" at about 6 p. m. of that day, and was, in the regular course of business, taken and transported over defendant's railroad on the following morning the 15th, at 10:30 o'clock; that some time in the afternoon of the 14th the plaintiff, a boy about eight years of age, in searching for four of his father's sheep, passed over defendant's tracks near its depot, and, in passing by the car in question, discovered something in the car, which he says, looked to him like powder, although he was then not certain what it was; that he went into the car, gathered up some of the substance he there found, and put it into what he called a "flap Jack box," and took and showed it to defendant's station agent, and asked him what it was; that defendant's agent told him he did not know what it was, and he then left the agent and placed a small quantity of the substance he had found in the car on some paper and lighted it with a match, which he had with him, when it flashed, and he then became convinced that it was powder; that he then took the powder he had in the box some distance away from the car and placed it into a hole and placed a heavy metal bucket over it and attempted to light it; and it did not take fire, so he went to the bucket to relight the powder, when his younger brother stirred the powder under the bucket with a stick and upset the bucket, at which time the powder suddenly flashed and set plaintiff's clothes on fire, which, before the fire could be put out, caused

him to be very seriously burned, the effects of which are permanent and quite serious.

It was also made to appear from plaintiff's evidence that in shipping powder the kegs in which it was shipped would at times become injured, and powder would leak therefrom. There was no evidence, however, that such was the case with the shipment in question, or with any that had gone into the Tintic district, but all that was shown was that according to plaintiff's evidence there was a considerable quantity of powder left on the floor of the car. It was also shown on behalf of plaintiff that there was a schoolhouse near defendant's depot grounds and its switch tracks, and that there was a public street or highway which passed near the depot where the public, including children, and especially boys, frequently passed, and that the boys including plaintiff, had frequently played on its depot grounds and in and about the cars standing on the tracks. It also appeared from the plaintiff's evidence that at the time of the accident school was not in session, and that it was vacation time; that the plaintiff, on the occasion in question, did not go to defendant's depot grounds or tracks either in going to or coming from school; that he was not attracted by the car, and was not invited to go there by any one, but went there on his own initiative and for the purpose of searching for his father's sheep; that the presence of the powder was unknown to the plaintiff at any time, and its discovery was purely accidental. There was no evidence that either powder or any other explosive substance had ever been left or had been found in any of the defendant's cars before, although the evidence was that large quantities of explosives were shipped to Tintic district every month; the Tintic district then being, and for many years having been, a mining district. It also appeared, however, that only two shipments of black powder had ever been made into the district, one of which was the shipment in question. Nor was it made to appear that any accident of a similar nature, or of any character, had ever occurred before, or that any explosives of any kind had ever been found in defendant's cars or upon its grounds.

On behalf of defendant it was also shown that it was the duty of the consignee to unload the explosives and to take proper care of them after they had reached their destination; that none of defendant's employés had anything to do with the unloading of the car; that one of defendant's employés removed the placard from the car after the powder had been unloaded by the consignee, as he was required to do. There is no evidence, however, that any of defendant's employés knew that any powder was left in the car by the consignee, or that the powder was discovered in the car while the same was taken from Eureka, where it was unloaded to Silver City, where it was taken to be reloaded as before stated. It was also made to appear a matter not made clear by the plaintiff's evidence, that the car was unloaded some time on the 13th of July, the day before the accident.

While plaintiff's evidence with respect to the powder being left in the car was contradicted by defendant's witnesses, yet such contradictions are immaterial here, since plaintiff's evidence must control, except upon such matters as are not shown by plaintiff's evidence, and where defendant's evidence stands uncontradicted. We have therefore referred to defendant's evidence only where reference is made to matters not shown by the plaintiff, and where its evidence stands without conflict and without dispute.

After the plaintiff rested the defendant interposed a motion for nonsuit, the principal ground being that plaintiff had failed to prove that the defendant was guilty of any negligence. The motion was denied. The defendant then produced its evidence, and, after the evidence was all in, it moved the court to direct the jury to return a verdict in its favor, no cause of action, upon various grounds, but principally that the evidence was insufficient to sustain a finding of negligence on the part of defendant. The motion was denied, and the defendant duly excepted to the court's rulings in denying the motions.

It is now insisted that the ruling of the court in denying its motion for a directed verdict was erroneous for the reason that there is no evidence which would sustain a finding of

negligence, and that therefore the motion should have been granted as a matter of course. Upon the other hand, counsel for plaintiff somewhat vigorously contend that the facts of this case bring it within what is known as the turntable doctrine, or the doctrine of attractive nuisances. They, however, further contend that if it be held that the case does not come within the foregoing doctrine, it, nevertheless, comes within the rule governing the storing of dangerous explosives, and that the defendant was guilty of negligence within that rule.

We shall first consider the doctrine of the so-called turntable cases, or what is otherwise known as the doctrine of attractive nuisances.

That question has been before this court three times. *Brown* v. *Salt Lake City,* 33 Utah, 222, 93 Pac. 570, 14 L. R. A. (N. S.) 619, 126 Am. St. Rep. 828, 14 Ann. Cas. 1004; *Smalley* v. *Railroad,* 34 Utah, 423, 98 Pac. 311, and *Charvoz* v. *Salt Lake City,* 42 Utah, 455, 131 Pac. 901, 45 L. R. A. (N. S.) 652.

In the case first cited we, with some hesitation, held that it came within the doctrine of the turntable cases, or, rather, within that of attractive nuisances. From the facts in that case it is clear that the city for a long period of time (more than 18 months) had knowingly, and against the protests of the parents, whose children were attracted by and exposed to the dangerous condition of a certain conduit there in question, maintained the conduit in that condition, when in fact it could, by very small effort or expense, have been made safe and harmless. Further, that the conduit was maintained within a short distance of a school, where a large number of children met daily, and where the boys, including the plaintiff's boy, in attending school almost daily, if not daily, resorted to the conduit for play, and which ultimately caused the death of plaintiff's boy. It was upon substantially those facts that we held that the question of negligence was for the jury.

In the next case, *Smalley* v. *Railroad,* supra, we had occasion to again go into the question very fully. In that case it

was contended that the doctrine of the turntable cases applied
to cases where boys had resorted to and played in and about
the yards and cars of a railroad company, and where the
Smalley boy while so playing was injured by being run over
by the wheels of a car. True, the evidence was to the effect
that the employés of the defendant had frequently warned
the boys to 'remain away from the cars, but the evidence was
also to the effect that, notwithstanding that, the boys fre-
quently played in and about the yards and the cars. It was
there contended that the railroad company was negligent in
injuring the child in the manner aforesaid. Mr. Justice
Straup, in speaking for the court, considered the question
from every possible point of view, and he pointed out that
railroad cars while being switched or in standing in the yards
do not, and in the nature of things cannot, constitute attrac-
tive nuisances, and hence cannot be classed as instrumental-
ities coming within the doctrine of the turntable cases. In
referring to the turntable cases Mr. Justice Straup said:

"The doctrine underlying the 'turntable' cases is that the leaving
or maintaining of a dangerous and attractive machine, or other
instrument or agency, upon one's premises, under circumstances
which naturally tend to attract or allure young children of imma-
ture judgment, and to induce them to believe that they are at liberty
to enter and handle or play with it, is tantamount to an implied
invitation to enter."

Railroad cars used in the ordinary course of business, how-
ever, do not come within the class of instrumentalities that
may be designated as attractive nuisances. That that is so
is made very clear in the opinion in the Smalley Case. If
railroad cars, although attractive to children, and especially
to young boys like the plaintiff in the case at bar, were
held to come within the doctrine of attractive nui-            2
sances, then every instrumentality which is attractive
to children, especially boys of tender years, and which in
playing with it might cause injury, must be held to be an
attractive nuisance.

We cannot pause here to repeat the reasons why in the
Brown Case we held the city negligent, nor why in the
Smalley Case we held the railroad company was not negli-

gent, but must refer the reader to those cases where he will by a mere cursory reading discover that both decisions are based upon sound doctrine, and he will also see why the case at bar does not come within the doctrine of the Brown Case.

In the Charvoz Case we again had occasion to examine the doctrine of attractive nuisances, and we there again pointed out when it does and when it does not apply. The rule laid down in *Smalley* v. *Railroad* and in *Charvoz* v. *Salt Lake City*, supra, is sustained by the great weight of authority.

In 3 Elliott on Railroads (2d Ed.) § 1259, the doctrine is carefully stated in the following language:

"In actions of injuries to children, as in other cases, there can be no recovery unless the defendant has been guilty of a breach of duty. We presume that no court would deny this fundamental doctrine, but, as suggested in a recent case, it is sometimes lost sight of, and 'in dealing with cases which involve injuries to children courts and juries have sometimes strangely confounded legal obligations with sentiments independent of law.' *Indianapolis* v. *Emmelman*, 108 Ind. 530. There is sharp conflict among the authorities, however, as to what the duty of a railroad company is to children who come upon its premises as trespassers or mere licensees. We believe the true rule to be that, although the age of the child may be important in determining the question of contributory negligence or the duty of the company after discovering him, the company is, in general, no more bound to keep its premises safe for children who are trespassers or bare licensees, nor invited or enticed by it, than it is to keep them safe for adults. On the other hand, while it may be contributory negligence for a child to play upon the track or any other dangerous place, yet if he has a right to be there, as, for instance, in a public highway, where it crosses the track, it has been held that he cannot be treated as a trespasser. So, if the company invites, allures, or entices a child into a place of danger, and negligently injures such child while there, it may be held liable, in the absence of contributory negligence, for such injury. Some of the authorities have applied this rule in favor of children when they would not have applied it to adults, and have held railroad companies liable where that which allured them was not near any public place in which they had a right to be, and where they necessarily became intruders or trespassers before they could reach it. This is particularly true of some of the turntable cases. In an early case the Supreme Court of the United States held that, 'While a railway company is not bound to the same degree of care in regard to mere strangers who are unlawfully upon its premises that it owes to passengers conveyed by it, it is not exempt from responsi-

bility to such strangers for injuries arising from its negligence or from its tortious acts,' and that when it leaves a turntable unlocked and unguarded in an exposed place where children are likely to be attracted by it, this may be considered as a constructive invitation to them, and the company held liable for their injury. This decision has been followed in many other cases, in some of which the doctrine therein announced was stretched to its utmost limits, in its application to the facts."

In section 1260, the author further says:

"The importance of this subject renders desirable a statement of what has been held in some of the conflicting authorities. On the one hand it has been held, in accordance with what we regard as the true rule, that cars are not 'dangerous machines' and attractive to children, within the meaning of the rule adopted in some of the turntable cases, and that a railroad company owes no duty to a child trespassing in its yards to see that he does not jump on its cars, or to fence its freightyard, nor to keep its cars in good repair, or the doors shut, nor to guard them so that such a child cannot be injured by loosening the brakes."

By referring to the undisputed facts in this case it will at once be seen that we have a case here where the defendant as a common carrier transported in the usual and ordinary way a car of explosives, including 100 kegs of black blasting powder. In view that it is only the powder that is in question here, the other explosives which were in the car, however dangerous they may have been, are necessarily out of the case. The car was transported in the usual way to the consignee, whose duty it was to unload it, which it did. The powder was removed from the car, and cared for in the usual way. It is, however, contended, and to that effect is plaintiff's evidence, that a considerable quantity of powder was left in the car when it was unloaded. There is no evidence, however, that the defendant or its agents had any knowledge of the fact, or that they were made aware that any powder was left in the car until after the accident. The evidence is without dispute that after the powder had been unloaded the car was, in the ordinary course of business and in the usual way, taken from Eureka on the morning of the 14th of July, the day of the accident to Silver City, the place where the accident occurred, to be there reloaded with freight, and it was so reloaded on the evening of the day of the accident.

The car reached Silver City at 10:30 a. m. on the 14th, and was placed on a sidetrack, and there remained until about 4 p. m., when it was taken to the Utah ore sampler to be reloaded with freight, which was done, and the car "billed out" at 6 p. m. on that day, and was taken away the next morning in the ordinary course of business. The car thus stood on the side track at Silver City from about 10:30 a. m. until about 4 p. m., during which time the plaintiff, in searching for his father's sheep, passed by the car and discovered what he thought, and after testing some of it learned, was powder. There is no evidence that either the plaintiff or any one else in Silver City knew that there was any powder in the car. Indeed, the plaintiff, in view of the evidence, could not even have known that the car had recently been used for the purpose of transporting powder or any other explosive, since, so far as the evidence discloses, he had no information upon that subject. The plaintiff therefore could not have been lured or attracted to the depot grounds of the defendant or to the car in question through any knowledge that there was powder in the car. It is also beyond dispute that the car was not left standing on a public street or so near one that plaintiff, or any other child, could have seen what was in the car from such street, and by reason of that fact could have been attracted or lured to the car. The evidence, however, is, that the manner in which plaintiff came to see what he thought was powder was by passing by the car, which was standing at a place where the side track was lower than the general surface of the ground, and while plaintiff was standing upon the "bank," that is, the natural surface of the ground, he could see into the car, and in that way discovered the powder. The plaintiff did not attend school, nor was he playing with other boys at the time. Indeed, he did not go upon defendant's depot grounds to play; he did not have any business with the defendant, and he did not go there by its invitation, but solely upon his own initiative and for the purpose before stated.

The foregoing statements have been made for the sole purpose of showing that, while the fact that there was a school

near by where children congregated, and that the dangerous instrumentality was in or near a public street or highway where people, including children, frequently pass, as a matter of right are of importance in most cases, yet in this case they can be given no force or effect, because the dangerous thing was not known to exist, and hence did not and could not have induced or lured the plaintiff, or any one else.

Again, the defendant had nothing to do with the dangerous thing except to transport it with due circumspection and care so as to injure no one who was where he had a right to be. Moreover, in view that nothing of a similar nature had ever occurred before, the defendant had a right to assume that the consignee had performed its duty and had removed all the powder from the car. In that regard    **4, 5** it cannot be charged with negligence until it knew or was put upon notice that some powder was left in the car. While ordinarily the question of whether a person knew, or ought to have known, of a particular fact is a question of fact for the jury, yet when, as here, there is no dispute concerning the facts, and there is absolutely nothing upon which such a finding or conclusion could be based, the question is one of law, as was held in the *Smalley Case*. The following cases are directly in point, and fully support the doctrine laid down in *Smalley* v. *Railroad* and *Charvoz* v. *Salt Lake City*, supra; *Barney* v. *H. & St. Joe Ry. Co.*, 126 Mo. 372, 28 S. W. 1069, 26 L. R. A. 847; *Kelley* v. *Benas*, 217 Mo. 1, 116 S. W. 557, 20 L. R. A. (N. S.) 903.

There is therefore nothing in this case which would authorize a finding that the plaintiff was enticed, lured, or attracted by anything the defendant did or omitted to do to the car in question, and hence the case clearly and manifestly does not come within the doctrine of the turntable cases or that of attractive nuisances.

This brings us to the question relating to dangerous explosives. As before stated, plaintiff's counsel insist that the judgment should stand upon the theory that the defendant was negligent in permitting the powder to be in the car as hereinbefore stated. In support of their contention, counsel

have cited many cases, among which are the following: *Harriman* v. *Railway Co.*, 45 Ohio St. 11, 12 N. E. 451, 4 Am. St. Rep. 507; *Railroad Co.* v. *Marsh*, 63 Ohio St. 236, 58 N. E. 821; *Powers* v. *Harlow*, 53 Mich. 507, 19 N. W. 257, 51 Am. Rep. 154; *Eckert* v. *Kiel*, 123 Minn. 114, 143 N. W. 122; *Vills* v. *City of Cloquet*, 119 Minn. 277, 138 N. W. 33; *Olson* v. *Gill Home Inv. Co.*, 58 Wash. 151, 108 Pac. 140, 27 L. R. A. (N. S.) 884; *Clark* v. *Powder Co.*, 94 Kan. 268, 146 Pac. 320, L. R. A. 1915E, 479, Ann. Cas. 1917B, 340; *Nelson* v. *McLellan*, 31 Wash. 208, 71 Pac. 747, 60 L. R. A. 793, 96 Am. St. Rep. 902; *Little* v. *James McCord Co.* (Tex. Civ. App.) 151 S. W. 835; *Miller* v. *Chandler*, 168 Ky. 606, 182 S. W. 833.

While in the opinion of the writer the courts in some of the foregoing cases have perhaps strained the law beyond reasonable and practical limits in sustaining judgments in favor of children of tender years where such children wandered upon the premises of others, yet a careful examination of those cases will convince the disinterested mind that the decision in none of them goes to the extent that it would be necessary to go in this case to sustain the judgment.

In order to illustrate the principle upon which the decisions in the foregoing cases are based, we shall make special reference to some of them.

The case of *Harriman* v. *Railway* is specially relied on by plaintiff's counsel. In that case a young boy was severely injured by a dangerous explosive which was left on or near the railroad track by the defendant at a point where the track crossed a pathway used by the public. The court, after discussing the general rules which control in the use of property, in the course of the opinion (45 Ohio St. 20, 12 N. E. 454, 4 Am. St. Rep. 507) says:

"These general rules are given controlling effect when only the conditions therein stated are present; but must be applied subject to other recognized principles in cases including other material conditions.

"It is apparent that there may be a substantial difference between absolving the owner from the active duty of providing against the danger of accident to a trespasser upon his premises, or one who

enters the same as a mere licensee, and giving him the same immunity when he knowingly places a highly explosive and dangerous instrument or agent in the way that he knows the licensee—a child of tender years—is habitually accustomed to go, and where an ordinarily prudent person would reasonably expect him to go, and be thereby injured."

It will be observed that the court has carefully stated the elements upon which liability in such cases is based. It is only where a highly explosive substance or other dangerous instrumentality is *knowingly* placed in a public place where people, including children, have a right to be, or where such a substance or instrumentality or agency is knowingly placed or left "in the way that he [the owner] knows the licensee—a child of tender years—is *habitually accustomed to go,* and where an ordinarily prudent person would reasonably expect him to go, and be thereby injured," that creates liability. (Italics ours.) When the elements that are there stated as constituting the basis of liability are contrasted with the undisputed facts in the case at bar, we have not the slightest hesitancy in saying that the decision in that case does not justify a recovery in the case at bar. The slightest reflection will make clear that the elements there stated are entirely lacking in this case .

Passing now to the case of *Railroad Co.* v. *Marsh,* supra, it will be seen that the case of *Harriman* v. *Railway Co.* is referred to and distinguished in the *Marsh Case.* The court however, again carefully states the doctrine upon which the *Harriman Case* rests. In the opinion (63 Ohio St. 242, 58 N. E. 823), in referring to the *Harriman Case,* it is said:

"In that case an unexploded signal torpedo was knowingly and recklessly left on the railroad track at a point where the public, including children, had for years been permitted to cross the track, using it as a path of travel, and the torpedo was picked up by a boy at that place while using the path of travel in the usual manner, as one of the public passing and repassing along the same. * * *"

The court again makes clear that in order to impose legal liability the owner must knowingly or recklessly place or permit the dangerous agency to be where others, and espe-

cially children, may reasonably be expected to be or where they have a right to be.

The decision in the case of *Powers* v. *Harlow*, supra, is clearly based upon the fact that the boy who was injured had a right to go into the shed where the explosive was carelessly stored by reason of the fact that his father was a "licensee coupled with an interest," and upon the further fact that the defendant in that case knew that some people, as well as children, frequently had occasion to use the shed, where the explosive was stored, as a shelter from rain and storms. It was accordingly held that from those facts negligence might be inferred. The *Powers Case* is frequently cited in the decisions of the courts and in several instances has been carried beyond its legitimate bounds. The effect of the decision is, however, somewhat restricted by what is said by the Supreme Court of Michigan in the case of *Ryan* v. *Towar*, 128 Mich. 463, 87 N. W. 644, 55 L. R. A. 310, 92 Am. St. Rep. 481, where the *Powers Case* is reviewed. The writer of the opinion in the case just cited reviews the authorities exhaustively upon both questions, namely, the turntable doctrine and the dangerous explosive doctrine. *Formall* v. *Standard Oil Co.*, 127 Mich. 496, 86 N. W. 946, is also a case where the *Powers Case* is referred to. The *Powers Case* can therefore not be considered a precedent for the case at bar as sustaining the judgment in question.

The decision in the case of *Eckert* v. *Kiel*, supra, is most liberal in allowing recovery in cases where children are injured by highly explosive substances. In that case the owner of a farm sold it to the father of the boy who was injured. In leaving the farm and at the time of surrendering possession to the purchaser the former left some dynamite caps, which were shown to be very dangerous explosives, on the premises, where the children would in all probability find them, and which were found by the purchaser's child, a boy of tender years, who was seriously injured by the explosion of one of the caps which he found and with which he was playing. In a later Minnesota case, *Larson* v. *Duluth, etc. Ry. Co.*, 142 Minn. 366, 172 N. W. 762, it is held that before

an owner of property can be held liable for injuries resulting from explosives which are found or discovered on his property even by one of his employés it must appear that he had notice of their presence. In the *Eckert Case* it was made to appear that the owner of the farm knowingly stored and knowingly left the dynamite caps where they were found, and the court held that those facts justified a finding of negligence on his part.

The case of *Vills* v. *City of Cloquet*, supra, is in principle the same as the *Eckhart Case*, and needs no further comment.

In *Olson* v. *Gill Home Inv. Co.*, supra, the gist of the decision is well stated in the first headnote in the following words:

"It is negligence for defendant, in violation of a city ordinance, to needlessly store exposed dynamite, fuse, and caps, not intended for immediate use, upon a shelf in an unlocked toilet on premises frequented by trespassing children, where it was apt to be found and taken, and the defendant is liable for injuries sustained by a boy 13 years of age, who took the same and was injured in attempting to cause an explosion, the defendant owing in such case the highest degree of care as to trespassing children."

It will be observed that, in view that the explosive was stored in violation of law, the act of so storing it in and of itself constituted negligence. It is perhaps for that reason that the court broadly held that "the highest degree of care" is due to trespassing children. Indeed, the holding could not be justified upon any other theory unless a trespasser is as a matter of law clothed with the same rights as one who has a right to be on the dangerous premises. To so hold without qualification would ignore the rights of property owners, which we cannot assume was intended by the court. The *Olson Case* is reviewed by the Supreme Court of Oklahoma in the case of *Pollard* v. *Oklahoma City Ry. Co.*, 36 Okl. 96, 128 Pac. 300, Ann. Cas. 1915A, 140, and it is there pointed out that the facts upon which the Olson decision are based are peculiar, in that the owner of the property stored explosives in violation of the law and in a grossly negligent manner.

The case of *Nelson* v. *McLellan*, supra, in effect is the same as the *Olson Case*.

In *Clark* v. *Powder Co.*, 94 Kan. 268, 146 Pac. 320, L. R. A. 1915E, 479, Ann. Cas. 1917B, 340, the gist of the opinion is stated in the headnote which reads:

"It is gross negligence for an agent of a powder company, after shooting an oil well with solidified glycerine to leave a quart of that explosive lying near the well. * * *"

The decision in that case is, however, based upon the ground that the explosive was extraordinarily dangerous, and that it was knowingly left where it endangered the life and safety of others.

In *Little* v. *James McCord Co.*, supra, it was held that storing or leaving highly explosive substances upon premises where it was known by the person storing the explosive that children congregated constituted negligence, although the explosives did not lure or induce or entice the children to go upon the premises where the explosives were stored.

In *Miller* v. *Chandler*, supra, the defendant was held to have been negligent in storing "dynamite and dynamite caps" at a place to which he knew that children went and which he knew "was used" by them. Here again the negligence was based upon actual knowledge.

There is not a single case that has been cited where the explosive was not knowingly stored or left at a place which was either a public place, or where it was known that children had a right to go, and where they ordinarily did go, or the place where the explosive was stored or placed was one to which children had access and to which any person of ordinary prudence and intelligence would reasonably expect that children would go and might suffer injury. In this case, however, the undisputed evidence is to the effect that the defendant did not know that there was any powder in the car. Not being cognizant of that fact, it could not guard against the accident. Moreover, the powder was left in the car by the consignee, who, it was shown by the evidence, was thoroughly competent to handle explosives, and who for years had dealt in and handled explosives of all kinds, and,

so far as the evidence shows, without injury to any one. In view, therefore, that the consignee was thoroughly responsible, experienced, and competent to handle explosives, and that it was its duty to remove the same from the car, the defendant had a right to assume that the consignee had removed all the powder from the car. In other words, it had the right to assume what all others have a right to assume, that one charged with a duty will perform it, and in so doing will exercise that degree of care which the law imposes. In this connection it is also important to keep in mind that the powder was not placed in the car to be used by the defendant for any purpose. Nor is it a case where the owner knowingly or recklessly leaves an explosive which he intends to use at some place where or near which people had a right to pass, or where children had been accustomed to pass or to play, and of which fact the owner knew, or by the exercise of ordinary care he should have known, and therefore is deemed to know. In this case the defendant merely transported the powder in the usual way, and delivered it to the consignee who received it in the usual course of business and took care of it.

Then again, the car was not placed in a public street or in a public place where the people, including children, had a right to pass, and where it might be expected they would pass. Nor did the placing of the car, even with the powder in it, amount to the storing of explosives. At most the powder was inadvertently or accidentally left in the car by the consignee, which car was not stored, but was being moved in the ordinary course of defendant's business and in the usual way.

The undisputed facts in this case, therefore, do not bring it within the doctrine of storing dangerous explosives on the owner's premises or at places where persons, including children, are known to go or near which they habitually pass. That question is carefully considered in Re Ingrid (D. C.) 195 Fed. 596, where it is held that where dangerous explosives were knowingly left in a railroad car at their destination for six days, and an explosion

occurred, that the leaving of the explosives in the car for that length of time did not bring the case within the doctrine of stored explosives, and therefore the railroad company was not liable unless it were shown that the explosion was due to its negligence, which, it was held, was not shown in that case. In *Fort Worth, etc., R. R. Co.* v. *Beauchamp*, 95 Tex. 496, 68 S. W. 502, 58 L. R. A. 716, 97 Am. St. Rep. 864, it is likewise held that knowingly leaving dangerous explosives in a car several days does not bring the case within the doctrine of storing explosives, and if the railroad company is held liable it must be because it is negligent in producing the injuries complained of.

With what, under the facts and circumstances of this case, the holding would be if another shipper to whom the car was assigned by the defendant for use, or his child, had been injured by the powder in using or attempting to use the car, we are not now concerned. We are not confronted with such a case. We are here dealing with a case where the defendant is sought to be held liable upon the ground that it was guilty of negligence in not anticipating a danger when the evidence shows that it had neither the knowledge, nor sufficient time to acquire knowledge, that there was any danger.

While the accident was an unfortunate one, yet it was one which the defendant could not have foreseen, and therefore cannot legally be held liable for. In the conduct of modern business enterprises, accidents will, and of necessity must, happen. The law, however, does not impose liability unless the party charged with negligence could by the exercise of reasonable care and diligence have prevented the accident. Although children of tender years are favored by the law, yet, even before one of them can recover for an injury, it must appear that the person causing the      7, 8 injury owed a duty to the injured child, and that he negligently failed to discharge that duty by failing to exercise that degree of care that the law imposed under the circumstances. It goes without saying that one cannot discharge a duty before it is known to exist, and while actual knowledge of its existence is not always necessary, yet the

facts must be such that knowledge may be imputed upon the ground that the person charged by the exercise of reasonable care ought to have known, and hence, in contemplation of law, did know. The undisputed facts in this case are not such as will impute knowledge to the defendant.

This case falls squarely within the principle of law stated by the Supreme Court of New Hampshire in *Olney* v. *Boston & Maine R. R.,* 71 N. H. 427, 52 Atl. 1097, wherein it is said:

"Whether the evidence is sufficient to authorize a finding that the negligence complained of was the legal cause of the injury is a question of law."

See, also, *McGill* v. *Maine, etc., Co.,* 70 N. H. 125, 46 Atl. 684, 85 Am. St. Rep. 618.

Defendant's counsel also insist that the court erred in charging the jury. There is no doubt that some of the instructions given by the court are contrary to the law as we have stated it in this opinion. In so far as those instructions conflict with the law as we have herein stated it, they were doubtlessly erroneous. In view, however, that we have disposed of the case upon the motion for a directed verdict and for the further reasons that the same errors will not again occur, it is not necessary to consider those instructions further.

It is further insisted that the court erred in refusing defendant's requested instructions on the question of contributory negligence. The defendant did not interpose a plea of contributory negligence, and hence did not tender that issue. It was, however, only necessary to plead that defense if the defendant desired to present affirmative evidence upon that question. It could, however, without an affirmative plea, take advantage of the evidence produced by the plaintiff if from a consideration of that evidence it was made to appear that he was guilty of contributory negligence which was the proximate cause of the injury complained of. That a defendant may rely upon plaintiff's evidence in that regard and may move for a nonsuit or for a directed verdict upon plaintiff's own evidence showing contributory negligence, and that he may request the court to

charge upon that question upon such evidence, is fully considered and determined in favor of the proposition by this court in the case of *Smith* v. *Ogden & N. W. Ry. Co.*, 33 Utah, 129, 93 Pac. 185. To the same effect is *C., B. & Q. R. R. Co. v. Cook,* 18 Wyo. 43, 102 Pac. 657, and cases there cited. The district court, therefore, either should have given defendants request, or, if it preferred to charge the jury in its own language, it should have done so. Where, therefore, there is evidence of contributory negligence, the trial court should not ignore that question merely because there is no affirmative plea of contributory negligence. In view, however, that we have disposed of this case upon the motion for a directed verdict, it is not necessary to determine whether the refusal by the court to give defendant's request in the language it was offered constituted prejudicial error or not.

From what has been said it follows that the judgment should be reversed with costs; and it is so ordered.

CORFMAN, C. J., and THURMAN, J., concur.

GIDEON, J. I concur in the order reversing the judgment and directing a new trial. The appellant was, in my opinion, under the evidence in this case, entitled to have an instruction submitting the question of contributory negligence to the jury. 3 Elliott on Railroads (2d Ed.) § 1261.

The requested instruction was timely made. The giving of the instruction as requested would not have been reversible error. A failure to give the instruction as requested, or some other instruction embodying the substance of the request, was necessarily prejudicial.

I am also of the opinion that appellant was not liable under the law of the turntable or attractive nuisance theory. I do not understand, however that respondent seriously contends that he is entitled to recover upon that theory.

I am unable to agree with the conclusions reached by the court on the remaining question considered. The effect of that conclusion precludes a recovery upon another trial. The result, in my judgment, is not justified by the facts in

this record, nor it is warranted by the authorities. I desire, therefore to state briefly why I do not agree with the conclusion of the court.

The testimony is abundant, and, in fact, is undisputed, that the place where the car was left with the powder in it was a place frequented by children, and that respondent and other children were in the habit of playing there at any time they desired. The place where the car was left and its surroundings were concisely described by the witness W. J. Storrs. His testimony, found in appellant's abstract, is as follows:

"* * * There was no fence dividing any of these tracks from any other portion of the town, and they were easy of access; children have played around the tracks a great deal and around the yards; they went in and about the yard; there were no obstructions of any kind to stop them; at times they would go in and about box cars or other cars on the track; this practice was continuous off and on during the time he (witness) was there during the year 1917, more in the summer time when the children were out of school and when the weather permitted them to be out of doors. * * *"

That testimony is corroborated by the respondent and other witnesses. Respondent's testimony, as found in the abstract, respecting the place where the car stood, is as follows:

"* * * I had been in the yards before digging coal and getting my sheep. I had played around the cars before, and gone in them, and other boys. There was a lot of them; there was the Painter kids and the Harris kid. I used to play with them around the cars. They were about my age. I played around there during the summer; I would go there about six times a week; I would go there almost every day. I went around cars and climbed into them. Nobody ever stopped me nor the other boys; the agent never told us not to. * * *"

The duty of any one handling explosives not to place them in a place where children are wont to congregate is recognized by all the authorities. The Supreme Court of Kentucky, in *Miller* v. *Chandler*, 168 Ky. at page 609, 182 S. W. at page 834, says:

"The authorities are abundant and harmonious that where one stores dangerous explosives in a place upon his premises which he knows is accessible to and frequented by children he does not exer-

cise the ordinary care and reasonable precautions he is bound as a social duty to exercise to prevent accidents to children playing with or in the vicinity of such explosives"—citing cases.

Again, the same court, in *Carter Coal Co.* v. *Smith,* 173 Ky. at page 844, 191 S. W. at page 632, says:

"If appellant was responsible for the presence of the dynamite caps in the place where they were found upon its premises, there can be no doubt of its liability to this little girl and her father for the injuries complained of, because, whether children were in the habit of frequenting the place or not, its accessibility to them was sufficient to render it negligent to place such a dangerous explosive as dynamite caps in an open cupboard."

If, therefore, appellant knowingly placed this car, or permitted it to be left, at the place where it was left, with the doors open, and it contained this explosive, appellant did "not exercise the ordinary care and reasonable precaution" it is bound "to exercise as a social duty to prevent accidents to children." I do not understand, however, that that standard of duty is denied, but it is contended that there is no testimony in this record that appellant had any knowledge that the car contained this explosive; hence no liability. I do not contend, nor do I understand that any one is contending, that liability would attach if the powder was in the car without the knowledge of the appellant or if the facts were such that appellant in the exercise of ordinary care should not be charged with such knowledge.

The argument that appellant did not have such knowledge, or in the exercise of ordinary care could not have had, is best answered by the testimony in the record. During the trial the manager of the Hercules Powder Company was called as a witness, and on cross-examination detailed the method, of stowing powder in the cars at the time of loading. His testimony was that the black powder was placed in steel kegs of about 25 pounds each. He also stated that in practically all shipments some of the kegs became broken. The natural result would be that the powder would run out of the kegs and be caught on the floor of the car. True, the same witness was called at a later time during the hearing of the case, and to some extent modified the statements made in the

early part of his examination. However, that testimony is in the record.

Appellant is a common carrier operating a railroad in the mining districts of this state. If it is usual in shipping powder that some of the kegs become broken it became a question for the jury to determine whether appellant should be charged with knowledge of such fact. Moreover, it is in the evidence that the Bureau for the Safe Transportation of Explosives requires that placards be placed upon cars containing explosives during shipments, and that they remain there until the explosives are removed. The car in question bore such placards. The car was unloaded at Mammoth on the day preceding the accident, and the placards were removed. That black powder was shipped in this car by the Hercules Powder Company over the railroad of appellant, and was loaded on or about the 12th day of July, 1917, is without dispute. That powder was in the car after it was placed on the tracks of appellant at Silver City is likewise not disputed. The agent of the appellant testified that after the accident causing the injury he went into the car, swept it out; found no powder at or near the door, although he did find a little powder, described as ''possibly a few pints,'' in one end of the car.

J. J. Mallaney, a witness for appellant, stated he had been engine foreman for appellant for something like 2½ years; that during that time he had occasion to handle shipments of black powder in the Tintic district; that he judged he had handled an average of a carload of explosives a month, and that there were frequently less than carload lots, some containing kegs of powder, boxes of caps, and such like material. On cross-examination he testified:

"Q. What were you when this accident happened? A. I was engine foreman there, and was working on the Mammoth end of the district at the time of this accident. * * * Q. So you say now that you have made it a business to examine box cars when they came in for the purpose of determining if there is powder in them and to see that they are all right for other commodities, because there are few boxes come in? A. Yes, sir. Q. That has always been the practice? A. Yes, sir; but in addition to that I

might qualify that statement by saying that there are no instructions that I know of in my railroad training where we are cautioned to be as careful as we are in the handling of powder explosives. Q. Yes; that is right. Now, while you don't examine them with that view, certainly you didn't know that these cars are ordinary powder cars; these box cars are either powder cars or hay cars? A. All powder cars are placarded on both ends and both sides. Q. Who takes off those placards? A. The conductor handling the car; his instructions. Q. It isn't the shipper at all? It isn't the consignee at all took it off, it is the conductor of the train? A. Well, I wouldn't answer that question that you place more directly, and I will state that on those cars where they contain inflammable material or powder, there are instructions to the conductor to see that they are removed immediately that the car comes into his charge. Q. The conductor is the one to do that? A. Well, he is responsible if it shall be done. I will answer your question that way. Q. And before he removes it it is also his duty to see that the inflammables are taken out? A. Yes; he can't remove it until he knows they are taken out. Q. In other words, the conductor on a freight train, if there is a car over the Salt Lake route, has the duty of inspecting the car that has contained powder, to see that it is taken out, doesn't he? A. Well, he can't remove the inflammable tags or explosive tags from the car unless he knows absolutely that all materials of that nature have been removed from the car. Q. So it is his duty before those cars are taken—before those inflammable placards are taken out—or before the car has continued in transit, to inspect the car to see that all inflammables or explosives are taken out; that is right, isn't it? A. Well, I wouldn't say that he will inspect the car, but he must know that. He cannot remove those tags until the explosives are removed. Q. I asked you whether he inspects it or causes it to be inspected; he would do one or the other? A. Yes, sir; he is responsible. * * * Q. That is the duty of the conductor, isn't it, before he removes the placards, to see that all inflammable material is taken out? A. That is my understanding; yes, sir. Q. There is no question about that is there? A. No; that is the law, as I understand it, of railroading. Q. Anyway, that is your practice? A. Yes, sir. Q. And was in 1917? A. Oh, yes. Q. And if the car has been opened, and there is still inflammable material in there, you don't leave it open, do you? A. Oh, no. * * * Q. You can easily determine by a careful inspection of a car whether there is any inflammable material in the car, loose powder or powder in packages, can't you? A. Oh, yes."

It will be seen from the testimony of the above witness that it was the duty of appellant to remove the placards be-

fore moving the car after the explosives had been unloaded, and to see that no explosives were left in the car. That duty was imposed by defendant's own regulations and rules. That defendant violated that duty and left the explosives in this car is without dispute. How then can a court determine as a matter of law that appellant had no knowledge, or in the exercise of ordinary care should not be charged with knowledge, of the fact that powder was in this car? No case is cited so holding. No principle of law is elucidated authorizing such deduction.

The length of time the car was in appellant's yard is no defense if it was there long enough to cause the injury. *Wells* v. *Gallagher*, 144 Ala. 363, 39 South. 747, 3 L. R. A. (N. S.) 759, 113 Am. St. Rep. 50.

There is, however, another element in this case not found in many of the reported cases. The testimony tended to show not only that the car was left with an open door on a switch where children frequently congregated or were permitted to go, but, in addition, after respondent obtained possession of the powder, he exhibited it to the agent of appellant, at the same time stating to him that he had taken it from the car, and asked the agent what it was. That some conversation was had between the agent of appellant and respondent respecting the powder taken from the car is corroborated by the agent's testimony. The agent testified that he met the little boy carrying a burlap sack over his shoulder in the yards near the depot at about the time stated, and said to him: "Hello, Danny. What have you got in your sack?" The boy replied: "I don't know, Mr. Mac. It looks something like powder." The agent inquired as to what he was going to do with the powder and received the answer that he was going to take it to his father. The agent asked respondent to bring it over to the station to let him see it. It appears that the agent was required to make a telegraphic report at about that hour, and he was in a hurry to get back to his work for that reason. Respondent did not take the powder to the station. These additional facts bring the case within the principle of law stated in *Folsom-Morris Min. Co.*

v. *De Vork*, 61 Okl. 75, 160 Pac. 64, L. R. A. 1917A, 1290, and in *Binford* v. *Johnston*, 82 Ind. 426, 42 Am. Rep. 508. In the *De Vork Case* the defendant mining company was engaged in coal mining. It had an uninclosed powder house near the mine. The powder was stored in this house in cans. Small quantities of powder were left in the cans, and the cans thrown upon the ground near the powder house. Two small boys gathered up some of this powder from the cans and carried it away. One of them was injured by an explosion. Defendant was held liable. It was further held that a person employed by the defendant known as a "powder monkey" was present, and, not objecting to the removal of the powder, his action must be regarded as the negligent act of the defendant.

"Ordinary care" is defined in 3 Words & Phrases, Second Series, 781, as follows:

"The terms 'ordinary care,' 'reasonable prudence,' and such like terms, as applied to the conduct and affairs of men, have a relative significance and cannot be arbitrarily defined. What may be deemed ordinary care in one case may, under different surroundings and circumstances, be gross negligence. The policy of the law has relegated the determination of such questions to the jury under proper instructions"—citing many cases.

In discussing the degree of care to be exercised by any one having control of explosives, the Supreme Court of Kansas, in *Clark* v. *Powder Co.*, 94 Kan. at page 271, 146 Pac. at page 321, L. R. A. 1915E, 479, Ann. Cas. 1917B, 340, says:

"The highest degree of care is required of all responsible persons having ownership or control of dangerous explosives such as dynamite and firearms. The utmost prudence and caution should be exercised to see that so dangerous an instrumentality does not work mischief to persons or property. The degree of care must be commensurate with the dangerous character of the commodity, and the duty to exercise this highest degree of care in keeping close custody of an article like dynamite *never ceases*." (Italics mine.)

The appellant had control and possession of this dangerous explosive. This is conceded. So long as that possession continued, the duty to guard against accident did not cease. The duty being primarily upon the appellant as the possessor of the powder, it could not escape or shift that duty as

against the respondent by presuming that the consignee had done its duty. Appellant's duty was to know that the explosive had been removed before placing the car, unguarded and with the doors open, in a place accessible to and frequented by children. It was appellant's further duty to prevent the respondent carrying away the powder after knowledge on the part of the agent that the respondent had this powder, and that he had taken it from appellant's car, being the car in question. Had either of those duties been performed, this unfortunate and lamentable accident would not have occurred.

The court, in my judgment did not err in denying the nonsuit nor in refusing to direct a verdict.

WEBER, J., concurs.