## CHARVOZ v. SALT LAKE CITY.

No. 2423.   Decided April 28, 1913 (131 Pac. 901).

1. NEGLIGENCE—"ATTRACTIVE NUISANCES." A thing may be attractive to children and inherently dangerous without being an attractive nuisance, within the doctrine of the turntable cases, which requires that the thing be in an unprotected condition, as well as attractive and dangerous.[1]   (Page 464.)

2. NEGLIGENCE—ACTIONS—SUFFICIENCY OF EVIDENCE—ATTRACTIVENESS OF NUISANCES. Evidence, in an action against a city for the death of a child by being drowned in a stream conducted through a ditch by the city, held not to sustain a finding that the child was attracted by the warm water in the ditch.   (Page 465.)

3. NEGLIGENCE—ACTIONS—SUFFICIENCY OF EVIDENCE—PROXIMATE CAUSE. Evidence, in an action against a city for the death of a young child by falling into warm mineral water conducted into a ditch by the city, held not to sustain a finding that the attractiveness of the water was the proximate cause of the child's death.   (Page 465.)

4. NEGLIGENCE—PROXIMATE CAUSE. To bring a case within the doctrine of the turntable cases, the attractiveness of the alleged nuisance must have been the proximate cause of the injury.   (Page 465.)

---

[1] Brown v. Salt Lake City, 33 Utah, 222, 93 Pac. 570, 14 L. R. A. (N. S.) 619, 126 Am. St. Rep. 828, 14 Ann. Cas. 1004; Smalley v. Railroad, 34 Utah, 447, 448, 98 Pac. 311.

5. NEGLIGENCE—ATTRACTIVE NUISANCE. A small stream of warm
mineral water conducted into a ditch and through a culvert by
a city, after it had been used for bathing and medicinal pur-
poses, would not constitute an attractive nuisance, so as to make
the city liable for a child's death therein, under the doctrine of
the turntable cases. (Page 467.)

6. EVIDENCE—JUDICIAL NOTICE. The Supreme Court will take
judicial notice of the fact that there are many miles of small
streams that flow in ditches or flumes in the state which may
be more or less attractive to children. (Page 468.)

APPEAL from District Court, Third District; *Hon. C. W. Morse,* Judge.

Action by Maurice A. Charvoz against Salt Lake City.

Judgment for plaintiff. Defendant appeals.

REVERSED AND REMANDED, WITH DIRECTIONS TO GRANT A
NEW TRIAL.

*H. J. Dininny,* City Attorney, and *Aaron Myers,* Assist-
ant, for appellant.

*M. E. Wilson* for respondent.

FRICK, J.

This is an action brought by respondent, as parent, to re-
cover damages for the death of an infant child, whose death,
it is alleged, was caused through the negligence of the ap-
pellant, a municipal corporation. After stating the neces-
sary matters of inducement, the acts of negligence relied
on are alleged in the complaint as follows: "That the said
city further owned, controlled, and maintained at the inter-
section of Eighth North and Third West Streets a certain
culvert conveying a stream of hot sulphur water, which
stream was likewise owned, controlled, and negligently main-
tained by the above-named city along the north side of
Eighth North between Second West and the west side of
Third West Street; that the said stream of water was from

ten inches to a foot in depth, and was negligently left by said city open and uncovered, and that the same was attractive to children, and should have been covered; and that the said culvert through which the stream of water was conducted by the said city was negligently left without any guards or other protection or means to prevent a person of the deceased's description from passing into said culvert."

It is then further alleged that on the 26th day of October, 1910, the infant child of respondent, of the age of upwards of seventeen months, fell into the "stream" of water, aforesaid, and was drowned, and that by reason of her death respondent was damaged, etc.

The appellant filed an answer to the complaint, in which it denied substantially all the material allegations, and as an affirmative defense pleaded contributory negligence on the part of both the respondent and the mother of the child, who was its custodian.

A trial upon these issues to a jury resulted in a verdict in favor of respondent for the sum of $1000. The court entered judgment upon the verdict, and appellant presents the record to this court on appeal and asks us to reverse the judgment.

The evidence upon which the verdict of the jury and judgment are based is, in substance as follows:

The respondent with his family, consisting of a wife and five children, ranging in age from nine years, the oldest, down to seventeen months and a few days, the youngest, the latter being the child in question, for several years lived on West Eighth North Street, near Third West Street, in Salt Lake City. His house was on the north side of the street, facing south. In front of the house, in the street, from six to eight feet from the sidewalk, at the point where the gutters are customarily and usually placed in the streets of Salt Lake City, there was a ditch about one foot deep and about eighteen inches wide, in which there was constantly flowing a stream of warm water which came from what is known as the warm springs, which are situated on the east side of North Second West Street, and, as near as we can get at

the exact distance from the record, respondent's house is between 600 and 800 feet in a northwesterly direction from said springs, and the place where the child was found dead, as hereinafter stated, is about 100 or 125 feet farther therefrom. The water of the springs comes out of the earth at a temperature of about 112 degrees Fahr., and where it leaves the bathhouse on its way into the ditch in question, running in front of respondent's house, the water has a temperature of from 103 to 105 degrees Fahr. Excepting where the water flows across Second West Street, it flows in an open ditch after it leaves the warm springs, and is necessarily somewhat cooler when it passes respondent's house. The water is what is known as white sulphur water, and it is used for bathing purposes and leased by the city to others. Some people drink the water, and a very large number bathe in it, and many of the bathers remain in the water, respondent said, who worked in the bathing establishment, from "three to four hours at a time." The amount of water flowing from the warm springs into the ditch is about 1.7 or 1.8 second feet, making a stream of water from six to eight inches deep and about eighteen inches wide. The banks of the ditch and the depth thereof are somewhat irregular, so that the water at places is deeper than at others. When the weather is cool or cold, some steam or vapor arises from the water. The fall of the ditch varies; the greatest fall being in front of respondent's dwelling, where it is about three and one-half per cent., and less than that above and below that point.

On October 26, 1910, about three minutes before twelve o'clock, noon, the wife of respondent and mother of the deceased child, named Ruth, was at or near the front door inside of her house, combing the hair of one of Ruth's little sisters. At that time Ruth was immediately in front of the house on the sidewalk leading from the front door to the sidewalk in the street running east and west in front of the lot, playing with a little boy and girl, both older than she. A few minutes after twelve o'clock the mother missed Ruth and at once started to look for her. She saw the little

boy and girl with whom Ruth had been playing going in
an easterly direction, and the mother started westerly, going
to Third West Street, which was about 100 or 125 feet west of
her house, and from there she went a little ways north
and looked and called for Ruth, but did not see her, when
she retraced her steps southerly, and in approaching the ditch
she saw the child lying in the water at the west end of the
culvert spoken of in the complaint, which was placed across
the ditch or stream at the point where the sidewalk running
north and south on Third West Street would run if it were
extended in a southerly direction. When the mother found
the child, it seemed lifeless, and although a doctor was sent
for immediately to St. Mark's Hospital, which was about
a block distant from where the child was found, all efforts
to revive the child failed.

The mother testified that the child "had never been near
the ditch before;" that it feared the ditch. Indeed, the
mother testified that all of her children feared the ditch,
and none ever fell into it. Respondent testified that sev-
eral families lived along the street where the ditch in ques-
tion is located; that the children would play in the street
and on the sidewalk, which is about eight feet distant from
the ditch, but when he was asked if any of those children
ever played "in close proximity to the stream" he left the
question unanswered. There is no evidence that any child
or children ever fell into the ditch, or in the water running
therein, or that any of them were actually attracted by the
water flowing in the ditch at any time. A lady, who lived
about 300 or 400 feet in a northwesterly direction from re-
spondent's house on Third West Street, stated the time of
the day when the mother found the child in the ditch, as
aforesaid, to have been a little later than the mother stated
it to have been. This lady also testified that little Ruth was
quick and active on her feet; that she at times would go to
the lady's house alone. Both the respondent and his wife
also said that the little girl was very active on her feet.

Upon substantially the foregoing evidence the respond-
ent rested, and appellant's counsel interposed a motion for a

nonsuit upon various grounds, but principally that there was no evidence of negligence. The motion was denied. The appellant then introduced some evidence, but it is not necessary to refer to it, except to state that from it it appeared that by actual measurement the amount of water flowing in the ditch from the warm springs was constant, and would be increased only now and then temporarily by reason of storms; that the volume of water passing through or under the culvert where the child was found was four inches deep and twenty inches wide; that the greatest velocity of the stream was about five and one-half feet per second, but at the culvert it was considerably less, because there was much less fall at that point; that there were about 500 miles of similar ditches in Salt Lake City; and that the culvert where the child was found was precisely the same in size and structure as were all such culverts on the line of sidewalks crossing the gutters or ditches. These facts were all practically conceded by respondent's counsel.

After introducing the foregoing evidence, in connection with other evidence, which it is immaterial to refer to, appellant also rested, and requested the court to direct the jury to return a verdict in favor of appellant upon the grounds specifically set forth in the motion, the gist of which is that respondent had failed to make a case for the jury.

The district court, in passing upon the motion to direct a verdict, in part, said: "I ruled upon the nonsuit as I did for the reason that the Supreme Court (this court) has decided in the Brown Case (*Brown v. Salt Lake City,* 33 Utah, 222 [93 Pac. 570, 14 L. R. A. (N. S.) 619, 126 Am. St. Rep. 828, 14 Ann. Cas. 1004]) that certain things maintained by the city were attractive to children of immature years, and were dangerous in themselves, therefore coming within what is commonly called the turntable cases and cases that have followed those cases. Then they (this court) proceeded to say that turntable cases ought not to be confined to dangerous machinery alone, but to anything that is attractive. It seems to me, from reading the facts and language of the Supreme Court in that case, that a stronger

case is made out in this case, bringing it within the turntable cases, than in the Brown Case." The court then proceeds to say that warm water flowing in a ditch is more attractive to children than a dark tunnel would be, such as was the thing complained of in the Brown Case. Proceeding further the court says: "The Supreme Court in that case (Brown Case) said, under the undisputed facts of that case, if they were the triers of the fact, they would have found there was no negligence. I hardly know just what they meant by that." The court, in addressing counsel, further said: "I will say this, gentlemen, it is a very close case, and I would not be surprised at all if the Supreme Court would view this case as not coming within the theory laid down (in the Brown Case), but it seems to me it does." The court then said: "Attractiveness—I think that is the only question to submit to the jury." The court therefore submitted the questions to the jury whether the water flowing in the ditch was attractive and dangerous to small children, whether the deceased child was attracted by the water, and whether her death was caused as a result of having been lured or attracted by the water in said ditch, and further directed the jury to find what, if any, damages the respondent sustained, if they found for him.

The principal reason urged by appellant's counsel why the judgment should be reversed is that the district court erred in refusing to direct the jury to return a verdict in favor of appellant, for the reason that there is no evidence in support of the material allegations of the complaint. By referring to the reasons given by the district court why it refused to direct a verdict, it becomes clear that the court's refusal was based upon what it contended this court, in the opinion deciding *Brown v. Salt Lake City, supra,* had said. We confess that we are unable to find anything that is said or intimated in the Brown Case which justifies the conclusion reached by the district court. Nor is there anything that we omitted to say in the Brown Case that in any way sustains the district court's conclusion. Of course, if we had said what the district court says we did, namely, that

the doctrine of the so-called turntable cases applies to "anything that is attractive" and is inherently dangerous to children of immature judgment, then the court might, perhaps, have been justified in ruling as it did. We, however, not only did not say, either directly or indirectly, that "anything" that is inherently dangerous and attractive or alluring to children of immature judgment comes within the doctrine of the turntable cases, but we took special pains to avoid a misunderstanding by saying precisely the contrary. In the Brown Case we pointed out that the decisions relating to the principle involved in the turntable cases were somewhat at variance with respect to what facts bring a particular case within the doctrine. After giving the subject careful consideration, we there classified the cases and adopted the rule daid down by Mr. Chief Justice Beatty in the case of *Peters v. Bowman,* 115 Cal. 356, 47 Pac. 113, 598, 56 Am. St. Rep. 106. In order to avoid any misapprehension with respect to just how far we adopted what the California Supreme Court, in speaking through Mr. Chief Justice Beatty, had said, we copied the language of the eminent jurist and said that the limitations of the doctrine pointed out by him were, in our judgment, proper limitations; and hence we adopted them as the rule of this court. As another precaution we, in the Brown Case, 33 Utah, 239, 93 Pac. 570, 14 L. R. A. (N. S.) 619, 126 Am. St. Rep. 828, 14 Ann. Cas. 1004, pointed out that many things may be really attractive or alluring to young children and may be inherently dangerous to them, but notwithstanding that fact the doctrine of the turntable cases could not be applied thereto. On page 240 of 33 Utah (93 Pac. 570, 14 L. R. A. [N. S.] 619, 126 Am. St. Rep. 828, 14 Ann. Cas. 1004) we again affirmatively adopted the doctrine as laid down by Mr. Chief Justice Beatty, and then proceeded to apply the principle involved in that doctrine to the facts of the case in hand. We need not repeat the language there used, since it speaks just as much for itself there as it would if we repeated it here, and we have no

desire at this time to depart in the least degree from the rule as laid down in the Brown Case.

In referring to that portion of the opinion in the Brown Case where we refused to interfere with the finding of the jury that the tunnel there in question was attractive and dangerous to the boys, the district court says: "I hardly know what they meant by that." Whatever faults may be attributed to the decision in the Brown Case, it certainly is free from the fault of being unintelligible, and especially with respect to the point now under consideration. The district court intimates that, inasmuch as the evidence in the Brown Case was practically undisputed, we therefore should have determined the liability of the city as a matter of law. With respect to that matter we gave specific reasons why we refused to interfere with the findings of the jury. Those reasons may not be convincing to all, but the language in which they are couched certainly is not obscure, and for that reason, if no other, we shall not repeat it here. It must suffice to say that, inasmuch as the boys, for about three years, had been permitted to make a playground and a resort of the tunnel, over the protests of the residents in the vicinity in which it was located to the city council, and as the tunnel was not necessarily dangerous at the entrance, or unless the boys went down to where the stream of water flowed into it, we simply held that under all the circumstances it was a question for the jury to say whether the city, through its council, should be charged with notice that the boys, in following their natural boyish propensities, might expose themselves to the dangers which were lurking in the dark passageway at the point where the water, which caused the death of young Brown, entered the tunnel. We are still of the opinion that upon that question, in view of all the facts and circumstances, reasonable men could have arrived at different conclusions; and hence the question was one of fact, and not of law. Upon the question as to whether the tunnel was attractive to the boys, the evidence left no room for differing opinions; but upon the question whether it was also dangerous, and thus constituted an attractive nui-·

sance within the doctrine of the turntable cases, reasonable men might well have differed, and for that reason we treated the latter question as one of fact. That is all there is to that portion of the Brown decision which the district court seemingly could not understand.

When the Supreme Court of the United States, in *Railroad Co. v. Stout,* 17 Wall. 657, 21 L. Ed. 745, decided that under the facts of that case the turntable was attractive and dangerous to children of immature judgment, and hence constituted an attractive nuisance, that court simply applied an old and well-established principle to new conditions. That court, of course, did not intend to, nor could it, lay down an inflexible rule whereby it could be determined in advance, as a matter of law, whether a particular case comes within the doctrine.

As pointed out by this court both in the Brown Case and again in the case of *Smalley v. Railroad,* 34 Utah, 447, 448, 98 Pac. 311,. a thing may be attractive or alluring to children and be inherently dangerous and yet not fall within the principle governing the turntable cases. Again, a thing may be attractive, but whether it is also dangerous may be a question of fact; or it may be both attractive and dangerous and yet not be the proximate cause of the injury complained of; or, although attractive and dangerous, it may nevertheless be common and natural and of a character that makes it impracticable to be guarded against. In all such cases the thing, whatever it may be, lacks the element which controls the doctrine of the turntable cases, namely, that to maintain it in an unprotected or unguarded condition constitutes it an attractive and dangerous nuisance. The well-considered cases in which the doctrine of the Stout Case is enforced all proceed upon the foregoing principle. It is obvious, therefore, that courts cannot in advance lay down an inflexible rule by which all cases may be determined. Nor will all reasonable men always agree whether the facts of a particular case bring it within the doctrine or not.

By applying the foregoing general principles to the case at bar, it at once becomes manifest that for several reasons

the undisputed facts that control this case leave it far outside of the fundamental principles which controlled the Brown Case. What are those facts? The evidence is conclusive that neither the deceased child, nor any child, was attracted by the water flowing in the ditch in question. The child's mother testified that all of her children, including the deceased child, feared and kept away from the ditch. The respondent, when asked whether the children of the neighborhood were attracted to and played in "close proximity" to the ditch, left the question unanswered. The presumption or inference, therefore, that the deceased child, as well as the other children in the neighborhood, followed their natural childish propensities of playing in the stream of water is absolutely dissipated or overcome. There is, therefore, neither direct nor inferential evidence in support of the implied finding that the deceased child was attracted by the warm water flowing in the ditch.

Nor is there any evidence to support the finding of the jury, which is necessarily implied in the general verdict, that the attractiveness of the water was the proximate cause of the child's death. As we have seen, the evidence is directly to the contrary. That the attractiveness must be shown to have been the proximate cause is clearly illustrated by the Supreme Court of Illinois in a very recent case, decided December 17, 1912, entitled *McDermott v. Burke*, 256 Ill. page 407, 100 N. E. 170, where the court said:

"Another essential condition to liability is that the attractive thing, or something inseparably connected with it, must be the proximate cause of the injury."

Indeed, the district court recognized this rule and so charged the jury in this case; but, as we have seen, there is no evidence to support an affirmative finding upon that subject, and a charge upon a subject which requires an affirmative finding, without any supporting evidence, is necessarily erroneous. There is nothing in the evidence au-

thorizing an inference that the child was induced to go to the stream by reason of the attractive character of the warm water. Nor is there any evidence with respect to what particular point along the stream she went, except what may be inferred from the fact that she was found at the west end of the culvert. All that the evidence discloses is that she was discovered in the lifeless condition before stated a short time after her presence was missed from in front of the house. It is a mere assumption, based upon no tangible fact that the child fell into the stream at some other point than from the culvert where she was found. It is further assumed, without proof, that the force of the water in the stream carried her little body through the culvert; and hence it is said the culvert should have had some protecting guards to prevent a child from passing under or through it. In making these assumptions no allowance for an accidental fall into the stream, either from the culvert, or from any other point along it, is made. As the testimony shows, the child was quite active, and now and then had gone to a neighbor's house, which was farther from her home than was the culvert. In view of these facts it is not unnatural that she should have gone as far as the culvert in the short time she was missed. But, after all, whether the child was caused to fall into the stream by some independent force, whether she accidentally slipped and fell into it in attempting to pass over the culvert, or whether she saw something and in an attempt to reach it fell into the stream, are matters which are left to sheer conjecture. There is neither a fact, nor a series of facts, from which it can logically be inferred that the reason the child fell into the ditch or stream was attributable to its attractiveness, and for that reason was lured to it. The only fact to build upon is that the child, in some manner, got into the stream. How or where is, and perhaps always will be, unknown. Under the most liberal rule of permitting verdicts to stand when based upon mere inferences, this verdict cannot stand, because it is entirely based on conjecture.

This opinion might end at this point, were it not for the fact that the case must be remanded. In view of that fact, we feel it our duty to pass upon the principal question, namely, whether the stream in question, under the undisputed facts and inferences deducible therefrom, comes within the principles governing attractive and dangerous nuisances, as they are defined by this court in the Brown Case.

We are clearly of the opinion that it does not. How is a stream of water which gushes forth from the mountain side, and in all probability has done so for centuries, a thing which falls within the doctrine illustrated in the Brown Case? There is absolutely nothing artificial about such a stream. The only thing that is artificial is the ditch in which the water flows, and if that had not been carved out by man the force of the water would soon have carved one out of the earth. This stream is therefore no more artificial than any other stream of water of similar size would be. It is contended, however, that its attractiveness and consequent danger lurk in the temperature of the water. Let it be conceded, for argument's sake, that warm water is more attractive to children, especially in certain seasons of the year, than cold water would be. Yet the question still remains: At what temperature does water become or cease to be especially attractive to children? Is it at the temperature of 50, 60, 70, 80, 90, or more degrees F.? Is it not a matter of common knowledge that in the hottest portion of the year, when children are most likely to seek water, the natural inclination of all is to seek cool water, rather than hot or even warm water? Treating the subject, therefore, from the standpoint of common knowledge and experience, a stream of water of approximately the temperature of the surrounding atmosphere, or a little cooler perhaps, would, during the summer season, be more attractive to children than would be water any considerable number of degrees warmer than that. Moreover, any stream of water of the size of the one in question would be quite as attractive and alluring to children of tender age as the one in question. This would also be so whether the stream was

natural or what might be called an artificial one, or whether the water was running to waste, or was at some point, at either end of the ditch or along it, being used for some useful purpose.

In view of this we are required to take judicial notice of the fact that there are perhaps thousands of miles of small streams that flow in ditches or flumes in the cities, towns, and country districts within the State of Utah which are quite as attractive and alluring to children as the stream in question. Such a stream is therefore a most common and natural thing, and not uncommon and novel. In referring to this question the Supreme Court of Arizona, in a recent case involving the doctrine governing attractive nuisances, said:

"It is a matter of common knowledge that alluring and attractive flumes, such as the one in question in this case, carrying running water are extensively used in this territory not only by miners in the necessary and proper conduct of their business but by farmers in the necessary diversion and application of the public streams to a beneficial use upon their lands in the cultivation of their crops. Not only flumes, but irrigation ditches, large and small, similar in purpose, construction, and use, and equally dangerous and alluring to the child, are to be found throughout the territory wherever cultivation of the land is carried on, and such conduits, practically impossible to render harmless, are indispensable for the maintenance of life and prosperity. There is no distinction that can properly be drawn for liability for injuries received by a child from any of such various means of diversion or use of water. Both as a matter of law and as a matter of public policy, we feel that the so-called 'turntable doctrine' should not be extended to cover such a case as is here presented." *Salladay* v. *Old Dominion, etc. Co.*, 12 Ariz., 129, 100 Pac. 442.

That case was one where a child fell into a flume which was carried across a lot where the children had habitually gathered and played before the flume was constructed, and continued to do so thereafter, and as it was claimed, were attracted by the flume. It appears from the record in the case at bar, as coming from a witness who was well qualified to testify upon the subject, that in Salt Lake City there were 500 miles of open ditches carrying water along the sides of the streets in a similar manner to that carried by the stream

in question at the time of the accident. It is true that the stream in question is the only one carrying warm water; but, as we have pointed out, that fact standing alone cannot make the stream an exception. Other streams of water are, we doubt not, equally as attractive as the one in question, and in view of the common experience referred to may in certain seasons of the year perhaps be more so, since in this case the evidence is positive and conclusive that neither the deceased child, nor any other, was ever seen playing in or very near the stream. We doubt whether this could be truthfully said of any other open stream of similar size in Salt Lake City. If it were held to be negligence, therefore, for the city to maintain the stream in question uncovered, how could it be held that it was not equally negligent in permitting any other streams, whether larger or smaller, to remain uncovered? Neither can the fact that the city leases the warm springs for a consideration make any difference. The water is nevertheless applied to a useful and beneficial purpose. But if it were not so applied it still, in obedience to the force of gravity, would continue, as it always must have done in the past, to seek a lower level, and would flow just as it was flowing when the accident happened.

We remark that in carefully reading the district court's reasons for its rulings, as they appear in the record, we are forced to the conclusion that the court entirely misapprehended the controlling principle of the Brown Case, as well as of the cases upon which that case is based. It seems almost incredible that the district court found something in the Brown Case which he affected to believe differentiated it from all other cases upon the subject of attractive nuisances, and that in that case it was held that all that was necessary in order to bring a case within the principle governing attractive nuisances is to show that the thing complained of was attractive and inherently dangerous to children of immature judgment. It seems to us that if the court had read that case, and the California case which we

undertook to follow, with any degree of care he must have arrived at a different conclusion.

The judgment is reversed, and the case is remanded to the district court, with directions to grant a new trial, and to proceed with the case in accordance with this opinion. Appellant to recover costs.

McCARTY, C. J., and STRAUP, J., concur.