## PAYNE v. UTAH-IDAHO SUGAR CO.

No. 3928. Decided December 14, 1923. (221 Pac. 568.)

NEGLIGENCE—ATTRACTIVE NUISANCE DOCTRINE HELD INAPPLICABLE TO BOY'S INJURY AT SUGAR BEET DUMP. Where injury to a boy of about 15 years, at an unfinished sugar beet dump maintained by defendant in a railroad right of way, was occasioned when he attempted to replace, in its pulley, a swinging cable which came in contact with high-tension wires maintained by a third person just outside the right of way, it appearing that the boy was not attracted to the dump by reason of the cable, and that no child had ever before made such a use of it, it cannot be said that defendant might reasonably have anticipated such use, and so have been required to guard against it, and the attractive nuisance doctrine was inapplicable, even though the dump platform had attracted the injured boy and his brother as a place to coast or race horses, such use not being dangerous.[1]

WEBER, C. J., dissenting.

Appeal from District Court, Sixth District, Sevier County; *Jos. H. Erickson,* Judge.

[1] *Brown* v. *Salt Lake City,* 33 Utah, 222, 93 Pac. 570, 14 L. R. A. (N. S.) 619, 126 Am. St. Rep. 828, 14 Ann. Cas. 1004; *Smalley* v. *Rio Grande Western Ry. Co.,* 34 Utah, 423, 98 Pac. 311; *Charvoz* v. *Salt Lake City,* 42 Utah, 456, 131 Pac. 901, 45 L. R. A. (N. S.) 652; *Bogdon* v. *L. A. & S. L. Ry. Co.,* 59 Utah, 505, 205 Pac. 571.

Action by Lionel C. Payne, an infant, by C. D. Payne, his guardian ad litem, against the Utah-Idaho Sugar Company. Judgment for plaintiff, and defendant appeals.

REVERSED and REMANDED. with directions to grant new trial.

*King, Straup, Nibley & Leatherwood* and *Booth, Lee, Badger & Rich,* all of Salt Lake City, for appellant.

*Irvine & Thurman,* of Salt Lake City, for respondent.

McCREA, District Judge.

With substantially no dispute the evidence in this case discloses the following salient facts:

Defendant, on October 8, 1918, commenced the construction of a structure, referred to in the evidence as a sugar beet dump, at a point about two miles north of the town of Vermillion, in Sevier county, Utah, and upon a portion of the right of way of the Denver & Rio Grande Railroad Company. The structure was of a type commonly used in beet sugar growing districts, and was adapted to the purpose of unloading sugar beets directly from the farmers' wagons or trucks into the railway cars upon a spur or side track to be constructed by the railroad company. The wagons or trucks were to be driven onto the structure, and the sugar beets dumped so that they were carried by gravity over the trestle or platform of the structure into the railroad cars. The structure consisted of inclined planes leading up and down from the platform so that he wagons and trucks laden with sugar beets could be driven up onto and down off from the platform. Above the platform timbers were erected constituting a scaffold, over and across which three wire cables extended, which, upon the side immediately adjoining the location of the contemplated spur track, were fastened to and were intended to raise and lower a screen or chute over which the beets were to pass before falling into the railroad cars. These cables passed over pulleys at the top of and at

each side of the scaffold, and on the side of the structure opposite the spur track hung loosely down the side of the structure a distance of approximately 30 feet from the pulleys, where they terminated within 2 or 3 feet of the ground, which at that point had been excavated somewhat below the level of the surrounding grounds to provide a driveway for wagons driven to and from the dump or unloading platform. The inclines on the platform were about 12 feet wide, and the platform was 19 or 20 feet high. The pulleys at the top of the scaffold over which the cables passed were about 30 feet high.

Some years prior to the building of the structure the Telluride Power Company had constructed an electric power line with a line of poles erected 4 or 5 feet west of the west line of the railroad right of way, and the west side of defendant's structure was about 12 feet east of such west line of the right of way, the intervening space being occupied by the driveway above mentioned, so that the pulleys were approximately 16 or 17 feet from the structure at the nearest point. From cross-arms upon the poles were strung wires with a capacity of transmitting a voltage of about 44,000 volts of electricity. The wire nearest the structure was 7 or $7\frac{1}{2}$ feet west of the cables as they were suspended from the structure, and was about $5\frac{1}{2}$ feet lower than the point where the cables passed over the pulleys. Neither the defendant nor the railroad company had any control over the operation of the power line, and there was no physical connection by wires or otherwise between the power line and the structure.

On October 8, 1918, the structure was substantially completed, except that the approaches to the inclines yet required some filling in with dirt for a distance of about 3 feet beyond the lower ends of the inclines; no sandbags or weights had yet been attached to the ends of the three cables hanging on the west side which were required as counterbalances; and the railroad spur or sidetrack having not yet been constructed, the structure could not be used for loading sugar beets in the fall of 1918. However, the hauling of

sugar beets began on October 24th and continued until November 23d, during which time they were weighed by the defendant at its scales near the loading platform, and were then piled in a field near by.

The structure was located in a rather level, cultivated area which was sparsely settled, the nearest dwelling house being about one-fourth of a mile easterly and another about one-half mile southeasterly, and one or two about a mile southerly and two about one mile northerly. While there were cultivated farms about the structure, it seems that most of those cultivating them lived about two miles southerly in the village of Vermillion, which had a population of between 100 and 150. The structure was not located upon a generally used and traveled highway, but was about one-half mile or more removed from such a highway. During the fall of 1918 a road had been constructed running easterly from the state or county highway and crossing the railroad right of way about 150 feet north of the structure. This road was used principally for hauling sugar beets during the fall of the year and at other seasons by only two or three families.

During the construction of the structure, as well as after work upon it had ceased, many of the people in the neighborhood visited it. Beets were being hauled by the farmers and were weighed by the defendant near the dump from October 24th to November 24th, and frequently children came with their parents while the beets were being weighed and unloaded, played around the structure, climbed up and down the ladder at one side of it, rode their horses up and down the approaches, and slid down the cables above referred to. Not all of the children who visited the structure were accompanied by their parents, and some of them were engaged in topping beets in the fields round about it. During some of the time, at least, that children were playing about the structure employés of the defendant were present, and the evidence leaves little room for doubt that they knew that children did play on and about it.

On Sunday, November 24, 1918, at about 2 o'clock in the afternoon, Leland Payne, then aged 14 years, and Lionel

Payne, aged 14 years and 8 months, left their home in Vermillion on horseback, drawing a sled behind them, with the idea of coasting down the inclines of the approaches to the beet dump. Some snow had fallen the night before, but they found the snow too light, and not sufficiently well packed for coasting, and, after standing around and talking for a few minutes on the platform, Leland slid down one of the cables to the ground, and Lionel, the plaintiff herein, climbed down the ladder. What followed is described by Leland substantially as follows:

"When we got down we stood under the platform and swung the cables back and forth—that is, north and south—I swung the cables to see how far they would flip in the air. We noticed that the cable was out of the pulley at the top, and we endeavored to put it back. We crossed a kind of ditch or place scraped out there as a roadway along the platform, and tried to flip the cable back into the pulley. I did this first. After I tried Lionel thought he could put it in better than I could, and he came over and tried to put it in. I think he walked across the excavation, though I am not sure. I was watching the pulley to see if the cable went into the pulley, and heard—saw a blue light, and buzzing noise, and as quick as a flash he fell to the ground."

On cross-examination he described it substantially as follows:

"When I got to the bottom I took hold of the cable and swung it back and forth; he also swung the cable north and south. It was the middle cable. I don't remember whether or not we moved the other cables. I swung once east and west. I just took hold of the cable and swung out and lit on the ground. I don't remember whether I did it more than once. I don't remember how long it was before I discovered that the cable was off the pulley, but I would say it was just a few minutes. I think I discovered it was off, and not Lionel. I tried to put the cable back on the pulley. We thought we got it off, and it was our place to put it back on. We thought we got it off by swinging it back and forth. I coiled the cable up and threw it back over, trying to throw it around the pulley. If I can remember right I was on the west side of the excavation on the wagon road holding the cable. It was pretty stiff. I was not very long in trying to throw the wire over the pulley; I don't think more than a minute. I tried it several times, maybe three or four times. Then Lionel came across the excavation and attempted to put it on himself. Then he undertook to throw it over. I don't remember for sure how long he worked at it before the con-

tact came. I think it was the first time he threw it, but I wouldn't be sure. I didn't see the wire hit, but could see the flash and saw him fall."

Lionel, the plaintiff, describes the occurrence substantially as follows:

"When we decided we could not slide down we decided to leave the dump, and Leland went over to one of the cables and swung down the cable. He swung out on the cable and went down. I went down the ladder and we got to monkeying around down there swinging the cables. There were three cables all hanging loose to the ground. They were made of wire, and were not weighted. They were not attached to the structure between the pulley and the end of the cables. We swung the cable back and forth. Leland got hold of one of them and swung it across a kind of pit dug there for the wagon to go under the platform. This is the pit referred to as the excavation or roadway. Leland took hold of the center cable and swung across the excavation. He discovered that the cable was off the pulley. I went across the excavation to see and try to put it on. He was standing right on the edge of the bank near the excavation of the wagon road. I don't remember where I was standing when he tried to put the cable on. He could not put it on, so I told him I thought I could, and I took hold of the cable and gave it a turn with my right hand and it came in contact with this high-tension wire. As I recall, I flipped it and it hit the first throw."

On cross-examination Lionel testified substantially as follows:

"I don't remember swinging on the cable, although I may have done. I know Leland swung across on it. We were using the cable for about a quarter of an hour or a little better. We had never flipped the cables before. I think I was on the east side facing toward Leland when he was on the west side of the excavation, and he was on the west side of the excavation when it was discovered that the cable was off the pulley. I think I walked across the excavation and tried to put it on once or twice, or maybe more. He was trying to curl it and put it on the pulley. As near as I can remember I told Leland I could put the cable on the pulley. He had tried and failed, and I said that I would try, or that I thought I could do it. I hardly think I saw the transmission wires. I would not be sure, but I don't think I did. There was nothing to prevent me seeing them only my attention was drawn to the pulley. I hardly think, when I took hold of the cable, I looked around to see what there was before I undertook to hook it over or flip it over. I don't think I looked around to see what there was about me before I undertook to replace the cable. I think I just grabbed

hold of the cable and flipped it. I think I just grabbed hold of the cable without looking or paying any attention to my surroundings, and tried to flip it over the pulley. I had hold right at the end of the cable, and my idea was that when the curl came to the end it would jerk the cable in to the pulley. My idea was that the cable being off the pulley I thought it ought to be on."

Preceding the day of the accident both Leland and Lionel had been at the dump before, and had played on and about it. They had ridden their horses onto and over the platform, and had run races over it. The plaintiff himself had worked at the beet dump prior to the accident with an uncle, and the plaintiff drove the team while his uncle handled the scraper and plow in filling in dirt at the ends of the inclines. There was another sugar beet dump about the same distance south of Vermillion as the one involved was north of that town, and the plaintiff had seen other dumps. There is nothing in the evidence to indicate that the structure involved here was in any respect different from any other, except that it had not been quite completed, as hereinbefore described. Lionel said he had hold of the cables prior to the time of the accident when he pushed them out of the way of his horses.

The plaintiff, Lionel C. Payne, by his guardian ad litem, brought suit against the Utah-Idaho Sugar Company for damages resulting from the injury so occasioned, and recovered judgment, from which judgment the defendant has prosecuted this appeal. Numerous errors are assigned, but those most strongly urged have reference to the submission of the cause to the jury upon the theory that the facts brought the case within the so-called "attractive nuisance doctrine." The pleadings as amended were framed upon that theory, and the instructions of the court were such as to submit the case to the jury upon that theory. The first question, therefore, and we may say the fundamental question presented, is the applicability of the so-called "attractive nuisance doctrine" to the facts above outlined.

This court has been called upon to consider the doctrine here involved in four cases, namely: *Brown* v. *Salt Lake City,* 33 Utah, 222, 93 Pac. 570, 14 L. R. A. (N. S.) 619, 126 Am. St. Rep. 828, 14 Ann. Cas. 1004; *Smalley* v. *Rio Grande*

*Western Ry. Co.*, 34 Utah, 423, 98 Pac. 311; *Charvoz* v. *Salt Lake City*, 42 Utah, 455, 131 Pac. 901, 45 L. R. A. (N. S.) 652; and *Bogdon* v. *L. A. & S. L. R. Co.*, 59 Utah, 505, 205 Pac. 571.

In *Brown* v. *Salt Lake City*, supra, the "attractive nuisance doctrine," frequently referred to as the doctrine of the "turntable cases," was definitely adopted as the law of this jurisdiction, this court quoting with approval the doctrine as announced by Mr. Chief Justice Beatty in *Peters* v. *Bowman*, 115 Cal. 356, 47 Pac. 113, 598, 56 Am. St. Rep. 101, as follows:

"The owner of a thing dangerous and attractive to children is not always and universally liable for an injury to a child tempted by the attraction. His liability bears a relation to the character of the thing, whether natural and common, or artificial and uncommon, to the comparative ease or difficulty of preventing the danger without destroying or impairing the usefulness of the thing, and, in·short, to the reasonableness and propriety of his own conduct, in view of all surrounding circumstances and conditions. As to common dangers existing in the order of nature, it is the duty of parents to guard and warn their children, and, failing to do so, they should not expect to hold others responsible for their own want of care. But, with respect to dangers specially created by the act of the owner, novel in character, attractive and dangerous to children, easily guarded and rendered safe, the rule is, as it ought to be, different."

In the last case cited, namely, *Bogdon* v. *Railroad Co.*, this court, commenting upon the Brown Case, said:

"In the case first cited we, with some hesitation, held that it came within the doctrine of the turntable cases, or, rather, within that of attractive nuisances. From the facts in that case it is clear that the city for a long period of time (more than 18 months) had knowingly, and against the protests of the parents, whose children were attracted by and exposed to the dangerous condition of a certain conduit there in question, maintained the conduit in that condition, when in fact it could, by very small effort or expense, have been made safe and harmless. Further, that the conduit was maintained within a short distance of a school, where a large number of children met daily, and where the boys, including the plaintiff's boy, in attending school almost daily, if not daily, resorted to the conduit for play, and which ultimately caused the death of plaintiff's boy. It was upon substantially those facts that we held that the question of negligence was for the jury."

In *Smalley* v. *Rio Grande Western R. R. Co.*, supra, this court distinctly held that the doctrine underlying the turntable cases was not applicable to the yards and cars of a railroad company, and in reviewing the Smalley Case the court, in *Bogdon* v. *Railroad*, supra, comments upon it as follows:

"Mr. Justice Straup, in speaking for the court, considered the question from every possible point of view, and he pointed out that railroad cars while being switched or in standing in the yards do not, and in the nature of things cannot, constitute attractive nuisances, and hence cannot be classed as instrumentalities coming within the doctrine of the turntable cases."

In *Charvoz* v. *Salt Lake City*, supra, this court held that the doctrine was not applicable where a child was drowned in an open ditch of warm water, distinguishing the facts from those in the Brown Case, and the court, among other things, said, in an opinion written by Mr. Justice Frick:

"As pointed out by this court both in the Brown Case and again in the case of *Smalley* v. *Railroad*, 34 Utah, 447, 448, 98 Fed. 311, a thing may be attractive or alluring to children and be inherently dangerous and yet not fall within the principle governing the turntable cases. Again, a thing may be attractive, but whether it is also dangerous may be a question of fact; or it may be both attractive and dangerous and yet not be the proximate cause of the injury complained of; or, although attractive and dangerous, it may nevertheless be common and natural and of a character that makes it impracticable to be guarded against. In all such cases the thing, whatever it may be, lacks the element which controls the doctrine of the turntable cases, namely, that to maintain it in an unprotected or unguarded condition constitutes it an attractive and dangerous nuisance. * * * It is obvious, therefore, that courts cannot in advance lay down an inflexible rule by which all cases may be determined. Nor will all reasonable men always agree whether the facts of a particular case bring it within the doctrine or not."

Finally, in *Bogdon* v. *Railroad*, supra, this court, after reviewing the earlier Utah cases, held the doctrine inapplicable where a boy, a minor, went upon the railroad right of way of the defendant looking for sheep, and while there entered a railroad car standing upon the track of the defendant and therein found some powder which he collected and exploded, thereby causing severe injuries to himself.

In view of the fact that this court has so fully and so recently announced the rule as it is to be applied in this state and has so fully presented the limitations within which the rule is to be applied, it is not necessary to refer here to decisions of courts of other jurisdictions. Suffice it to say that such decisions relate to such varied situations with such varied results as to occasion a great deal of confusion.

In this jurisdiction the law, as announced in the cases cited, when applied to the undisputed facts in this case, leads necessarily, we believe, to the conclusion that those facts do not bring the case within the attractive nuisance doctrine as so announced by this court, and that the trial court was in error in submitting the case to the jury upon that theory.

Under the evidence, we believe that the structure involved here was not shown to be either novel in character or attractive or dangerous to children, within the meaning of the Utah cases. It was no more novel in character than a cattle loading chute or a water tank upon a railroad right of way, and is not shown to have been any more attractive or dangerous than such structures might be. Even though we assume that it was attractive as a coasting place, or a place over which to race horses, that it had been so used by children, and that the defendant was charged with notice that it was attractive to boys and girls for such purposes, still there is not the slightest suggestion in the evidence that the structure was at all dangerous when so used. The injury sustained by the plaintiff was from a use which no reasonable man could or would have anticipated, and from a use to which no child is shown to have theretofore put it.

It may indeed be seriously questioned whether a lad of plaintiff's age and mentality may avail himself of the doctrine here involved; but we think that certainly he cannot under the peculiar facts in this case. As to him the loose hanging cables did not constitute an attraction, for with apparent deliberation he chose not to use the cables for the purpose of sliding down them, as his associate did a few moments before the accident. Not until his companion had discovered that the cable had come off the pulley and not un-

til his companion had failed in his efforts to replace it did the plaintiff concern himself with the cable at all. And then, when he did concern himself with it, he did with the cable that which the defendant certainly could never have anticipated that he or any other boy or girl would do with it. He swung it outward in an attempt to flip it back upon its pulley, and swung it so far that it came in contact with the electric wire of the power line, over which the defendant had no supervision or control, and which was outside of the right of way upon which defendant's structure was built. It certainly cannot be said that his conduct was that of a child of immature years attracted to a dangerous instrumentality maintained by the defendant, so as to bring him within the doctrine of the decisions of this court herein before referred to. Nor can it be said that the circumstances of the accident were such that the defendant might reasonably have anticipated them, and so have been required to guard against them. The comment of this court in the case of *Bogdon* v. *Railroad*, supra, is equally applicable here:

"There is * * * nothing in this case which would authorize a finding that the plaintiff was enticed, lured, or attracted by anything the defendant did or omitted to do to the car (structure) in question, and hence the case clearly and manifestly does not come within the doctrine of the turntable cases or that of attractive nuisances."

The plaintiff was not attracted to the structure by reason of the loose hanging cables, and when he reached the structure he was not attracted to them by any appeal that they made to his childish instincts. There is no evidence that any other child at any time was attracted by and amused itself with the cables, except that it does appear that plaintiff's companion safely slid down one of the cables immediately before the accident, and there is not the slightest suggestion in the evidence that sliding down the cables was at all dangerous. At any rate, the plaintiff was not attracted by the cable as a thing to slide down upon, nor was he injured in so doing. He was not injured until he made use of the cable in a most unusual and extraordinary way, and used it in such a way

that it cannot possibly be said that the defendant might have reasonably anticipated such use.

Other errors assigned, and not embraced within the question already passed upon we think it unnecessary to discuss and determine at this time, for the reason that the reversal of the case upon the ground indicated will probably require a reframing of the whole pleadings and a submission of the case upon an entirely different theory.

The judgment is therefore reversed, and the cause is remanded to the district court, with directions to grant a new trial; appellant to recover costs.

CHERRY, J., concurs.

THURMAN, J., disqualified.

FRICK, J. I concur in both the reasoning and conclusion of District Judge McCREA. In view, however, that it is insisted that this case is controlled by the principles involved in the so-called turntable or attractive nuisance cases, and hence was properly submitted to the jury, I feel constrained to make a few observations in addition to what is said in the clear and able opinion of District Judge McCREA.

Since the doctrine of the attractive nuisance or turntable cases was announced about 50 years ago, both the scope of that doctrine and its limitations have become well established. The doctrine of the attractive nuisance cases arose squarely upon the principle of implied invitation by the owner of premises. Every owner who either expressly or by implication invites another or the public to come upon his premises is by law required to exercise ordinary care and caution so as not to cause injury to those who come as a result of such invitation. The erection or maintenance of some attractive and dangerous instrumentality upon the premises which attracts and lures children of tender years who lack judgment and discretion, and who are prone to follow their childish propensities of diversion and play when such premises and instrumentalities are accessible to them, is in law deemed equivalent to an implied invitation by the owner to such

children to come onto the premises and to play with such instrumentality. The law therefore imposes the duty upon such owner to exercise ordinary care to prevent injury to the children that go upon, or to exercise ordinary care so as to prevent them from going upon, the premises or, having access to the instrumentality, which lures and attracts them. The absence of such care constitutes negligence, and in case of injury to a child of tender years the owner of the premises is liable in damages in an action of tort. The doctrine properly applied is wholesome, humane, practical, and just. The doctrine, however, applies only to children of tender years, and to instrumentalities that are artificial and are unusually attractive, and that by ordinary effort can be made reasonably safe. The doctrine was not intended to burden the owners of premises by casting liability upon them for every injury that might be suffered by those who go upon the premises without invitation either express or implied whether young or old. Those who go without an invitation either express or implied are mere trespassers, to whom the owner owes no duty except not to willfully inflict an injury upon them. In view that children of tender years are regarded as what in law is termed unconscious trespassers, they are excepted from the rule just stated, provided they are attracted to the premises as before stated.

The instant case does not come within the doctrine of the attractive nuisance cases for the following reasons: (1) That the beet dump in question was a lawful and useful structure, and was to be used for a purpose which made it impossible to exclude even children from going to it; (2) the structure was still in process of construction, and not fully completed, as alleged in the complaint and as shown by the evidence; (3) the one who suffered the injury was not a child of tender years, but was a school boy of nearly 15 years of age, and, as the record shows at the time of the injury, was in the eighth grade in the common schools of this state, and at the time of trial in his second year in the high school. To hold that an American school boy 15 years of age, and in the eighth grade, is to be considered as a child of tender years, and is protected by the doctrine of the turntable cases, to

my mind, goes so far beyond the principle upon which the attractive nuisance cases rest that it would amount to a travesty of justice. A boy of the age and intelligence of the plaintiff in this action cannot legally be heard to say that he did not know that it was wrong to go upon premises to which he was not invited and where he had no business. A mere cursory reading of the plaintiff's evidence discloses that he was a boy of keen and active mind. His intellect was at least equal to thousands if not hundreds of thousands who either volunteered or were drafted for service in the late World's War, and his educational acquirements were far above the educational acquirements of vast numbers of those who so served. To hold, therefore, that the plaintiff comes within or is protected by the attractive nuisance doctrine is to compel every farmer and every owner of property who erects buildings or structures or who maintains such upon his premises where boys and girls are apt to and do congregate and play, to guard such buildings and structures, or, in case of injury to any one of the playing children, to be mulcted in heavy damages and thus be subject to the danger of having the savings of a lifetime swept away by a jury's verdict. If this is a jury case, then the case of every boy, whatever his age or intelligence, is a jury case, and the cases of *Smalley* v. *Rio Grande Western Ry. Co.*, 34 Utah, 423, 98 Pac. 311; *Charvoz* v. *Salt Lake City*, 42 Utah, 455, 131 Pac. 901, 45 L. R. A. (N. S.) 652, and *Bodgon* v. *L. A. & S. L. R. R. Co.*, 59 Utah, 505, 205 Pac. 571, are all wrong. Moreover, if those cases are wrong, then the recent case of *United Zinc & Chemical Co.* v. *Britt*, 258 U. S. 268, 42 Sup. Ct. 299, 66 L. Ed. 615, which reflects the latest expression of the United States Supreme Court respecting the doctrine which controls attractive nuisance cases, is all wrong. Then, again, the facts in the case at bar clearly demonstrate that no one could have foreseen that the cable would come off the pulley, and, if it did, that some boy would attempt to put it on again, or that in attempting to do so he would carry the cable so far outside as to come in contact with a live electric wire. By viewing what happened retrospectively, no doubt, one can see how it could have been prevented. That, however, is not the test.

Unless in the ordinary course of conduct one can anticipate the occurrence, or, at least, some occurrence that ordinarily would result in injury, he is not legally culpable for not having prevented it. To say that a jury may in every case determine whether a certain act or omission constitutes culpable negligence is tantamount to saying that a jury and not the law imposes duties. To do that would merely amount to this: That one jury to-day would condemn one, while to-morrow it would exonerate another without any reason for so doing. Duties are imposed by law, and juries merely determine whether the duty that the law imposes has been met. In doing that juries have no more right to resort to conjecture or to depart from what is natural, reasonable, and usual than any one else. If, therefore, juries clearly depart from natural, usual, and ordinary course of conduct in arriving at their verdicts, the verdicts are against or contrary to law and it is the duty of the courts to interfere. Where, as in this case, therefore, the facts, when viewed in the light most favorable to the plaintiff, do not impose a legal duty, the question of liability is one for the court, and not for the jury. This principle is again illustrated and applied by the Supreme Court of the United States in the case last above referred to. In my judgment but one conclusion is permissible in this case, and that is that the structure in question is not within the attractive nuisance doctrine, and hence the plaintiff cannot avail himself of that doctrine.

GIDEON, J.

I agree that the beet dump in question is not such a structure or instrumentality as comes within the rule of the turntable cases or as can be designated an attractive nuisance. I regard the facts in this case as falling squarely within the principles stated by this court in *Bogdon* v. *L. A. & S. L. R. R. Co.,* 59 Utah, 505, 205 Pac. 571. In that case the place where the car was left and where the child found the powder was a place frequented by children. The testimony is undisputed in the present case that the beet dump was frequented by children, and that they were in the habit of

playing around and upon the dump. The suspension of the cables in close proximity to the highly charged wires was a hidden danger, just as the powder was in the Bogdon Case.

I am also of the opinion that the case should be reversed upon another ground, namely, the failure of the court to give to the jury appellant's request No. 6. By that request the court was asked to submit to the jury whether the appellant, in the exercise of ordinary care, should have anticipated or expected or foreseen that children of tender years and immature judgment would make use of the cables as the testimony showed respondent did. I do not find that that request was given in substance in any other instruction. The appellant, in my judgment, was entitled to that or some similar instruction. Even though it be conceded that the suspending of these cables in the manner shown and in close proximity to the electric wire was such as to impose a duty upon the defendant to protect children of immature judgment, nevertheless the question remains whether the appellant could or should have anticipated the use made of the cables by respondent.

WEBER, C. J. (dissenting). I dissent. As I view them, the facts as stated in the majority opinion cannot be passed upon as a matter of law; they present jury questions.

In the Brown Case, the allurement consisted of a dark hole in one of the city water conduits. The inherent danger consisted of the stream of water which emptied into the conduit some 600 feet from the entrance hole. As to whether such premises brought the case within the turntable doctrine was a question for the jury, as shown by this extract from the opinion by Mr. Justice Frick:

"We have no hesitancy in saying that, if the facts were for us to pass upon, we should be forced to arrive at a conclusion different from that reached by the jury; for it would be quite difficult for us to see how the officers of the city as reasonably prudent men should have foreseen that boys would go down a dark passageway of over 600 feet in length, nearly 400 feet of which was totally dark, and play therein, and that, although they did so, they would go or fall into the water coming into the conduit from the Jordan Canal. And if childish instincts induced them to resort to the conduit to play 'jail' or otherwise, one would naturally assume that they would

instinctively avoid going into the dark passageway to the length of nearly two ordinary city blocks. In the statement herein made that, were we permitted to pass on the facts and determine the question, not as matter of law, but of fact, we would arrive at a conclusion different from that found by the jury, the Chief Justice authorizes us to say that he is not prepared to say that, if he were a trier of the fact, he would find in favor of the defendant on the question of negligence (upon this question he .expresses no opinion); but that he is, however, clearly of the opinion that the facts amply justify the court in submitting the question of negligence to the jury."

In the present case the jury could well find that the structure was attractive to children from the fact that it did attract them. It is a matter of common knowledge that at every modern playground provided by a progressive community for children, "coasters" will be found. The principal difference in plan and design between the playground coaster and the beet dump, a photograph of which is in the record, is that the beet dump presents the added attraction of the long, dangling cables upon which the children could swing to and fro. On the ordinary supervised playground, as one of the instrumentalities of play, we find just such dangling cables or ropes. The beet dumps and cables, which the jury was certainly justified in finding were attractive and alluring to children, were in and of themselves not dangerous, but they (the cables) were placed within seven feet of a high-voltage transmission wire line, as described in Judge McCREA'S opinion, and added danger to that which was attractive and enticing to children. It would have been practicable to have avoided the danger, and that "without serious inconvenience and without great expense to the owner."

As in the Brown Case, the court directed the jurors' attention to the particular matters that they were required to find in order to return a verdict for the plaintiff, and the issues as to whether there was an attractive nuisance and whether it was dangerous, and all the other questions involved, were submitted in well-considered and clear instructions. "The jury, with all the facts and circumstances before them, found all these issues in favor of plaintiff." Whether the structure was alluring and attractive, whether it was made dangerous by the defendant, or whether in the exercise of reasonable

care and prudence defendant could have foreseen the danger, were all questions of fact for the jury's determination.

In *Faylor* v. *Great Eastern G. M. Co.*, 45 Cal. App. 194, 187, Pac. 101, the second headnote reads:

"Whether an unguarded stope in a mining tunnel, with small push cars left unfastened, was a trap enticing and dangerous to children, and whether ordinary care was exercised to prevent children from wandering into danger while playing in the vicinity, and whether a child 11 years old was old enough and intelligent enough to anticipate, apprehend, and avoid the danger of falling into the stope, *held* to be questions for the jury."

The facts in the Faylor Case present no clearer question for the jury than the facts here. The following excerpt from the opinion in that case is in point:

"The ultimate question as to whether this was a trap enticing and dangerous to children, and whether the company exercised ordinary care in failing to close the tunnel's mouth or otherwise to prevent children from wandering therein while playing with the cars, and from falling into the stope, and whether the deceased child was old enough and intelligent enough to anticipate, apprehend, and understand and to avoid the danger, were questions which are usually to be determined by the jury. *Brown* v. *Salt Lake City*, supra. We think the jury had sufficient evidence before it to justify a finding that the car, tunnel, and stope, taken together, did constitute an attractive nuisance within the general rule of the turntable cases, and in reply to the statement that no case has been found extending the doctrine to such a state of facts as this, it may be said in passing that, as has been shown, the rule has been applied to cases other than machinery, and, further, that while matching cases is an interesting mental recreation, it is not by matching cases, but by the correct application of sound legal principles that a case such as this is best determined, and that in at least one able decision the rule has been applied to a state of facts very similar to those of the instant case—*Brown* v. *Salt Lake City*, supra."

I think the judgment should be affirmed.