## UNITED STATES .v. BRAUNSTEIN et al.

District Court, S. D. New York.
Dec. 26, 1947.

John F. X. McGohey, U. S. Atty., of New York City (Henry L. Glenn, Asst. U. S.

Atty., of New York City, of counsel), for plaintiff.

Wegman, Spark & Burke, of New York City (Richard J. Burke, of New York City, of counsel), for defendant Sidney Braunstein.

MEDINA, District Judge.

The United States has brought suit for breach of a contract whereby defendants, it is said, agreed to buy from it 9599 twenty-five pound boxes of raisins unfit for human consumption which could be converted into alcohol. The parties have stipulated that an interchange of telegrams, hereinafter referred to, constitutes the contract, if there was one, that furnishes the foundation for the suit. Defendant Sidney Braunstein asserts this interchange of telegrams did not create a contract, and moves for summary judgment.

On July 21, 1945 the Commodity Credit Corporation, an instrumentality of the United States, issued Announcement AWS-11 which invited bids for the purchase of the off-condition raisins in question and laid down requirements to which all bids must conform. Thus, all bids were required to state that they were subject to the terms and conditions of that announcement and to designate what bonded distillery the raisins would be shipped to, should the bidder be successful. The announcement also required that the raisins be paid for by check within ten days from the date of the telegram accepting the bid.

The interchange of telegrams began on August 3, 1945, when the defendant Pearl Distilling Co. sent the following telegram to David Ludlum of the Washington office of the Commodity Credit Corporation:

"David Ludlum, Contracting and Adjustment Div Sales Branch Office of Supply U S Dep of Agriculture

"Offer ten cents per pound for 9599 boxes of raisins located Cleveland Ohio

"Pearl Distilling Co"

This telegram lacked the required reference to Announcement AWS-11 and did not designate the distillery for shipment. On receiving the telegram, David Ludlum telegraphed the Pearl Distilling Co. referring to Announcement AWS-11 and asking for shipping information. Pearl Distilling Co. supplied this information by a telegram of August 7, 1945 and inquired about shipping costs.

The Commodity Credit Corporation's telegram of August 9, 1945 is the crux of this whole interchange. It reads:

"Pearl Distilling Company
"377-91 East 163rd Street
"New York, New York

"Subject terms announcement AWS 11 CCC accepts your August 3 offer to purchase and August 7 wire giving shipping instructions for 9599 boxes raisins at 10 cents per box plus freight and 3 per cent tax from Cleveland, Ohio to New Brunswick, New Jersey, at 45 cents per cwt.

"Forward certified check in the amount of $2,138.92. Contract AW-S (F) 31752
"Commodity Credit Corporation
"David S Ludlum"

Pearl Distilling Co. had offered ten cents a pound. The telegram of August 9th specified a price of ten cents a box. The total price of $2,138.92 appears to have been calculated on the basis of ten cents a box, although the method of calculation is not entirely clear. Since a box contained twenty-five pounds, the price was off by something like twenty-three thousand dollars. It was the Commodity Credit Corporation's intention to accept the offer of ten cents a pound, but one of its employees had made a mistake in preparing the telegram of August 9th and in calculating the price.

When the defendants received this telegram, they did nothing and no check was sent to the Commodity Credit Corporation. Ten days later, when the time for receipt of the check had expired, the Commodity Credit Corporation looked into the matter, discovered its error, and sent this telegram:

"Aug 20 PM 4:28
"Pearl Distilling Co
"377-91 East 163 St

"Reourtel August 9 contract AW-S (F) -31752 covering sale of raisins should read at 10 cents per pound instead 10 cents per box also certified check should be in the

amount of $25,176.52 instead of $2,138.92 Please confirm

> "David S Ludlum
> "Commodity Credit Corporation"

Again the defendants did nothing, and so matters stood for two months. The raisins, of course, had not been shipped to the defendants. Then, on October 19, 1945, the Commodity Credit Corporation notified the defendants that if they failed to pay for the raisins by October 25, the raisins would be sold and the defendants held for any loss. The defendants did not pay, the raisins were sold at a loss, and the United States brought suit for breach of contract.

There is a contract if the telegram of August 9 was an acceptance of the offer of August 3. If there can be an issue of fact as to whether that telegram of August 9 was an acceptance, this motion for summary judgment must be denied. To put it another way, does the mistaken substitution of "ten cents per box" for "ten cents per pound" coupled with a calculation of the total price based on the wrong figure defeat, as a matter of law, what was intended as an acceptance?

The basic principles of law involved here are simple. To create a contract, an acceptance must be "unequivocal," Restatement, Contracts § 58 (1932), "positive and unambiguous," 1 Williston, Contracts § 72, Rev.Ed.1936, and "must comply exactly with the requirements of the offer." Restatement, Contracts § 59 (1932); Iselin v. United States, 271 U.S. 136, 46 S.Ct. 458, 70 L.Ed. 872 (1926). A reply to an offer that fails to comply with these requirements is a rejection. 1 Williston, Contracts § 73, Rev.Ed.1936.

Certainly no reasonable man could say that on its face the telegram of August 9 met these requirements. The mention of a price foreign to the negotiation renders the effect of the telegram uncertain and ambiguous. Furthermore, the mere use of the word "accept" does not automatically make a communication an acceptance. Candland v. Olroyd, 62 Utah 605, 248 P. 1101 (1926).

The government, however, insists that the defendants knew perfectly well what the telegram of August 9 meant; that,

in spite of a clerical error, it was an acceptance; for no reasonable man could think that the government was in effect rejecting an offer of ten cents a pound and making what amounted to a counter-offer of ten cents for a twenty-five pound box. The argument comes to this: that a reasonable man would disregard the error and see behind to the intention that, but for a surface obscurity, was perfectly clear.

There is limited merit to this contention. The law would not allow the defendants to treat the telegram of August 9 as a counter-offer which their acceptance could turn into a contract seriously disadvantageous to the government, since there was obviously something dubious about it. "An offeree may not snap up an offer that is on its face too good to be true." 1 Williston, Contracts § 94, Rev.Ed.1936. It is a justifiable conclusion that the defendants did not think the telegram was a counter-offer, but that they knew the Commodity Credit Corporation's intention varied from what the words of the telegram expressed. This conclusion, however, does not help the government. "If either party knows that the other does not intend what his words or other acts express, this knowledge prevents such words or other acts from being operative as an offer or acceptance." Restatement, Contracts § 71(c) (1932).

The government next urges that the court may interpret·the telegrams in the interest of justice so as to make a contract out of them, citing 3 Williston, Contracts §§ 603, 605, 616, 618-620, 628, 629, Rev.Ed.1936. There it is shown that courts have disregarded clerical errors or particular words, and have supplied and interposed words in their attempt to give writings a construction which would not render them void or meaningless. This court is urged to interpret the telegram of August 9 into an acceptance on the basis of such authority.

It is true that there is much room for interpretation once the parties are inside the framework of a contract, but it seems that there is less in the field of offer and acceptance. Greater precision of expression may be required, and less help from the court given, when the parties are merely at the threshold of a contract. If

a court should undertake to resolve ambiguities in the negotiations between parties, disregard clerical errors, and rearrange words, leaving out some and putting in others, it is hard to see where the line of demarcation could be drawn and the general effect would inevitably be a condition of chaos and uncertainty.

But the courts have refrained from reforming offers and acceptances. Thus, in the classic case of Harvey v. Facey, [1893] A.C. 552 (P.C.), it would have taken but little interpretation to construe as an offer the defendant's telegram, "Lowest price for Bumper Hall Pen £900," which was a reply to plaintiff's telegram, "Will you sell us Bumper Hall Pen? Telegraph lowest cash price." But the Judicial Committee of the Privy Council ruled otherwise.

In 1. Williston, Contracts § 72, Rev.Ed. 1936, are cited several examples of communications held to be insufficient as acceptances. They too would have needed but slight interpretation to come up to the legal standard, but again. the courts were reluctant to interpret parties into a contractual status. Indeed, this very reluctance may have been one of the causes for the development of the doctrine of quasi-contract. · And it seems significant that the fictions indulged in that branch of the law were made only in instances of clearly defined unjust enrichment. There is nothing of that kind here.

 It may be rigorous to disregard a purported acceptance because of a clerical error, but if there is any fault, it lies with the Commodity Credit Corporation. "Since one who speaks or writes, can, by exactness of expression, more easily prevent mistakes in meaning, than one with whom he is dealing, doubts arising from ambiguity of language are resolved against the former in favor of the latter." Restatement, Contracts § 236, comment d (1932). ·

A decision for defendants will not interfere with commercial dealings by requiring formality in offer and acceptance. It will merely mean that if a purported acceptance repeats the terms of the offer, the acceptor takes the risk of his own clerical error in repetition.

The government made a point in passing, without pressing it, that the telegram of August 3 in which the Commodity Credit Corporation asked the defendants for shipping instructions was itself an acceptance, since only the successful bidder would be asked for these instructions. This telegram, however, was insufficiently unequivocal to be an acceptance. Restatement, Contracts § 58 (1932).

At the request of the government, and to avoid any possible misconception of the attendant facts and circumstances, an opportunity was afforded for the filing of supplemental affidavits, which were finally forthcoming. They add nothing of any relevance to the sole issue of offer and acceptance, which by the stipulation of the parties depends upon the telegrams above referred to.

Motion granted. Complaint dismissed.